## *IN RE* ROBB'S ESTATE.

### *EX PARTE* EASON, ESCHEATOR.

1. EVIDENCE—PEDIGREE.—In questions of pedigree, hearsay evidence is admissible, subject to the following qualifications: the declarations must be those of a person related by blood or marriage to the family to which the declarations refer, and such relationship must be established *dehors* such declarations ; the declarant must be dead, and the declarations made *ante litem motam*. The judge must decide whether the declarants were members of the family, and the declarations, therefore, admissible, and the jury must decide upon the effect of the declarations, less strictness of proof being required by both judge and jury after a great lapse of time.

2. IBID—IBID—MARRIAGE.— There being in this case some testimony to show that the claimant and the testator were born seventy years ago, in a foreign country, of the same parents, who occupied a lowly station, and were recognized as the children of those parents by the families of both, the trial judge erred in requiring stricter proof of marriage, and in excluding the declarations of the deceased mother and other members of her family, and in granting a non-suit.

3. LAPSE OF TIME—PRESUMPTIONS—LEGITIMACY.—After the lapse of seventy years, proof that a person is the child of a certain man and woman, and was so recognized and treated by the parents and other members of the family, raises a *prima facie* presumption of legitimacy.

4. EVIDENCE—LEGITIMACY—OBJECT OF DEVISE.—A testator devised and bequeathed all the residue of his estate " unto such person or persons and in such shares as they shall be entitled to the same under the laws of the State aforesaid relating to the distribution of the estates of intestates." A resident of Utah claimed this estate as sister and sole distributee, but her claim was resisted on an allegation of testator's and her own illegitimacy. She offered a witness to prove a declaration by testator in his life-time, that he had a sister and nieces in Utah who would inherit his money, but the testimony was excluded by the trial judge. *Held,* that the testimony should have been received as an admission by testator that the claimant was his lawful sister; and, if she were not so, then it tended to show who were meant by the general description in the residuary clause of his will.

5. ESCHEAT—NON-SUIT.—In proceedings under escheat, a non-suit is improper, as there should be the verdict of a jury finally determining the issues of fact raised by the traverse.

Before WALLACE, J., Charleston, August, 1891.

This was a petition of Jean Robb Muir, traversing an inqui-

sition of escheat of the estate of William Robb, deceased, obtained on the application of W. G. Eason, county auditor of Charleston, and *ex officio* escheator, of March 30, 1887. Certain testimony was ruled out by the trial judge, who said:

The difficulty in my mind, as I have already indicated, is caused by the authority which counsel has made the text of his argument, viz : sections 201 and 202 on the law of evidence. Section 202 reads: "Pedigree, from the nature of things, is open to proof by hearsay in respect to all family incidents as to which no living witness can be found." That simply means that a living witness may testify to what he has heard in the family. "If what has been handed down in families cannot be in this way proved, pedigree could not, in most cases, be proved at all. Nor is such tradition in its best sense open to the objections to hearsay. A., called as a witness to pedigree, may, indeed, say, 'B. told me this;' but pedigree testimony usually takes another shape. It is not, 'B. told this,' but such was the understanding of the family. The constitution of a family may become a matter of immediate perception. A., B., C., and D. are brought up as brothers in the same household. If any one says to A., 'B. is your brother,' A. would not regard such an announcement as any more disclosing a fact to him than would the announcement that he is a human being. That B. is his brother is one of the conditions of his family existence. He fits into a family of which B. is a member, in the same way that one stone fits into an arch of which another stone is part. The position of the one presupposes the condition of the other. As to remoter relations, the same reasoning applies, though with diminishing force. The recognition of such relations form part of a family atmosphere ; the existence of such relationship constitutes the family. A family in this sense is an object of immediate instead of mediate perception. To say that A. is a brother, or a cousin, or an uncle, or an aunt, is not hearsay, but primary evidence. But the recognition of pedigree is not limited to such conditions. Even when there is no family *consensus* to be appealed to, what is said by one member of a family to another as to pedigree may be received to prove such pedigree. Hence, it is admissible for A. to prove, with the

limitations hereafter expressed, what was told him by deceased relatives as to family relations. Nor does the fact that family registers exist exclude proof of declarations of deceased members of the family. Even *ex parte* affidavits *ante litem motam* have been received for this purpose."

The whole of that section presupposes the existence of the family, and the following section confirms that view. Section 202 reads: "To the admissibility of declarations, when offered as authoritative in pedigree, it is essential that they should be made by lawful relatives. Thus, the declaration of deceased servants and intimate acquaintances are rejected, even though coming under the head of dying declarations; nor are declarations of illegitimate relations received. The law resorts to hearsay of relations upon the principle of interest in the person from whom the descent is to be made out, and it is not necessary that evidence of consanguinity should have the correctness required as to other facts. If a person say another is his relative or next of kin, it is not necessary to state how the consanguinity exists. It is sufficient that he says, A. is his relative, without stating the particular degree which, perhaps, he could not tell if asked. But it is evidence, from the interest of the person in knowing the connections of the family. Therefore, the opinion of the neighborhood of what passed among the acquaintances will not do. But the declarations of a deceased husband as to his wife's legitimacy are admissible, as well as those of her blood relations."

So it is conclusive that when a witness is a lawful member of a lawful family, when that primarily appears, he can testify as to the traditions of the family; not otherwise.

Now, in regard to this matter of presumption, the case of Johnson against Johnson, an old authority in our State, decides that when it is established that a child or children are the child or children of certain parents, and they have been recognized as the child or children of certain parents for thirty years, their legitimacy is presumed. But now that is the presumption of a fact to be proven, and cannot be made the foundation of other evidence to prove the same fact. Now, as I have said, it is the member of a lawful family who can testify, and who are com-

petent witnesses, and in order to make them competent it must first be made to appear that there is a lawful family, and that they are lawful members of it. A member by affinity is just as much a member as a member by blood. For instance, if a wife is taken into a family, she is a member of that family by intermarriage with one who is a member of that family, and, therefore, her testimony would be competent. As to the McFarlane family, my attention has not been particularly called to all the evidence on that point. If the McFarlanes are a lawful family, then the question arises whether the Robbs did, or did not, belong to that family.

After further argument upon the competency of the testimony of Mrs. Janet Drysdale and Mrs. Mary Gentleman as to family traditions, Judge Wallace further ruled:

By the Court: Gentlemen, I have listened with a great deal of pleasure and instruction to all these discussions, because questions like these do not often arise. I do not think I have ever had any experience in these questions before. I will have to travel in previously undiscovered country, because I know of no case, and no illustration has been brought to my mind, which covers the precise point I am called on now to decide, and that is just this: Whether it is competent for Mrs. John Gentleman, whose husband's mother was a McFarlane, to testify to declarations in regard to family connections, by John Gentleman, her husband; that declaration relating to the son of the Robb family, who was a son of William Robb and Jean McFarlane. Now, it has been frequently gone over and held in this trial that only those are competent witnesses who were shown to be connected with a family, the family relation, the existence of the family, first having been established. Of course, that means a lawful family, and that the person to testify is a lawful member of that family. They must be connected with that family by blood or affinity.

Now, whenever the law books use the word "blood," it means lawful descent—lawful connection. I think counsel will hardly find an instance where the term connected by blood does not mean lawful connection. Affinity, of course, is marriage. Now, what was the relationship of John Gentleman to William Robb?

It is John Gentleman's declaration which it is proposed to introduce here. Now, William Robb the 2d had no blood relation, and, so far as appears, no connection by affinity with John Gentleman. There is no proof that William Robb was ever lawfully married to Jean McFarlane or was her lawful husband. Then, John Gentleman was the blood relation of Jean McFarlane, but there is no evidence to show that he was a blood relation of William Robb; and unless William Robb and Jean McFarlane were connected by affinity, then, of course, he could not testify as to anything in connection with William Robb. If William Robb married Jean McFarlane, even supposing that for the sake of the argument, I don't think that would make William Robb a member of the McFarlane family, in the proper sense of the word. We know it don't in the descent of estates. If a man marries a woman and she dies leaving him surviving, and an estate subsequently falls in, the husband has no interest in it, the wife being dead. If he was a member of her family, he would have an interest in it. When a man marries a woman, he don't become a member of her family by that fact, so far as I can see. Now, where does the kinship come in, so far as the proof goes? There is no evidence that the mother and father of William Robb 3d were ever married, and unless they were married, William Robb 3d was not John Gentleman's cousin, and was no kin to him by blood or affinity, so far as the proof shows now. If there is any evidence of their relationship by blood or affinity it has escaped me. So, if there is no relationship by blood or affinity between them, then it is not competent to prove the declarations of John Gentleman in this regard.

Mr. Mordecai: I understand your honor as ruling out the testimony of Mrs. Janet Drysdale, so far as it relates to the declarations of John Gentleman.

By the Court: Yes, that is my ruling. (The traverser's counsel excepted to this ruling.)

Mr. Mordecai: And your honor refuses to allow in the declarations of Mrs. Jean Robb Muir as to pedigree?

By the Court: Yes, I see nothing to make me change my mind on that point, and I am glad that there is another tribunal before which all these questions can go and be settled.

The traverser's counsel excepted to the ruling.

The traverser rested her direct case at this stage of the proceedings.

Mr. Barker, representing the escheator, moved for a non-suit, on the ground that the traverser had utterly failed, by any proof, to show that she is entitled to the estate as the lawful heir of William Robb ; and that, on the contrary, she has furnished complete proof that she is the illegitimate daughter of Jean McFarlane Stewart, the wife of Alexander Stewart, of Menstrie; and that the decedent, William Robb, is the illegitimate son of William Robb No. 2 and Jean McFarlane.

After hearing full argument from the counsel on both sides, Judge Wallace ruled as follows :

By the Court: The questions which have arisen in this case have been very difficult, and counsel have bestowed great learning and labor upon their discussion. I regret extremely that I must decide them off-hand, and I do so simply because I must. I can, therefore, simply give the inclination of my mind after what I have heard. If I had the time for study I could, perhaps, give my conclusions with much more clearness and satisfaction. But this is a jury trial, and no matter how complex the questions, they must be decided off-hand.

The inclination of my mind, gentlemen, is that there is no proof of the marriage between William Robb and Jean McFarlane, the putative father and mother of William Robb, the decedent, and of Jean Robb Muir, the claimant, in this case. It is first shown that William Robb No. 2 and Jean McFarlane lived in the house with the parents of Jean McFarlane, and that while they lived there William Robb was born. That is all! There is no evidence that they lived together in that house, in the sense of living together as man and wife. There is no evidence that they occupied the same room and no evidence that they sustained any marital relations to each other in that house. The only proof is that they lived together in the house just as boarders might live together in a house in this city.

In the case of Johnson and Johnson, where presumption of marriage was raised by the lapse of time, there was at least a proof that the parties lived together and were reputed to be

man and wife. The court called that the very slightest evidence of marriage—insufficient proof in itself, but, under the state of facts, the lapse of thirty years, the presumption was raised that they were married and that their children were legitimate. How much stronger was that case than this, where there was no evidence that they lived together in that porter's lodge as man and wife—no evidence except that they lived in the same house, and that while they lived there a child was born and another was begotten. There was not sufficient proof of marriage upon which to base the presumption. In the case in our own courts there was some evidence of marriage, because it was testified there: "I did not know the people, but I heard they were man and wife." There is no such evidence here. There is no proof in this case that anybody has said that William Robb No. 2 and Jean McFarlane sustained to each other the relation of man and wife, or that they lived together holding themselves out as such.

In the next case in our own reports, the person who was to be held as a lawful husband admitted, under his signature to a deed, that the person to whom it was supposed he was married was formerly known to be his wife. He admitted that, and upon that admission it was held that after a great length of time marriage would be presumed. But there is no such thing here. After one child was born at the lodge, and the old gentleman died, and the whole family had to leave that building and go to another, they immediately go apart, and, as the witness said, agreed to separate. There is absolutely nothing to show what relation existed between them before that; nothing to show that before that they sustained the relation of husband and wife, and the only thing that can be presumed from the evidence before us is, that there had been an illicit connection between them, and that they agreed that that should be dissolved; and so far as we know that agreement was observed. There is no evidence that at some future time, not at the house where old Mrs. McFarlane was placed by Lord Abercrombie, but after she left that house (and it must have been at Stewart's house, because the witness says her first recollections relate to her being at Stewart's house), her father visited her mother and

treated her as man and wife.    That must have been at Stewart's house, and while Stewart was treating her as his wife, which was a curious state of things, to say the least of it.

There is, therefore, no evidence to show a formal celebration of marriage.    There is no evidence that before witnesses they agreed to sustain the relation of man and wife.    There is nothing to show that they ever held or recognized that relation as existing between them.    One of those three things must exist to constitute the marital relation.    Under the laws of South Carolina, all that is required to constitute the legality of marriage and the legitimacy of children is that while the parents were living together as man and wife, there was a concurrence between them that they were husband and wife.    But where is there any proof of that sort here?    The fact that a bastard is received among his kindred and friends is no proof of marriage. I own that I cannot see any evidence of marriage in this case, and it is necessary to establish the marriage in order to entitle the claimant to recover.    Therefore, I am constrained to grant the motion for non-suit.    As I said in the opening of my remarks, I regret very much that I am compelled to decide these questions off-hand, but I must, because it is a part of our judicial system.

I don't think there is evidence to identify the person to whom the bequest is made in the will, although I think such evidence is competent, and, perhaps, in the end, will be necessary.    I desire to say, in that connection, that I think parol testimony is admissible, to show who are the persons referred to in the will; but I also hold that there has been no competent testimony offered on that subject.

The traverser appealed on the following grounds:

1. Because his honor erred in excluding the question asked the traverser as well as the answer thereto, "What were the names of your parents?" on the ground that it was hearsay and incompetent.

2. Because his honor erred in excluding the question asked the traverser as well as the answer thereto, "Where were you born?" on the ground that it was hearsay and incompetent, "because Mrs. Muir is not competent to testify to any family

relations between her father and mother," until those relations are established *aliunde.*

3. Because his honor erred in excluding the questions asked the traverser, Jean Robb Muir, as well as the answers thereto (numbers 6, 7, 8, &c.), they being all of a similar character to, and excluded upon the same grounds as, the question and answer in the exception just preceding.

4. Because his honor erred in insisting upon stringent proof of marriage, as if marriage was the primal issue in the cause, when the *real* issue involved is *relationship*, and the issues of marriage and legitimacy, if they arise at all, are secondary issues, only coming in obliquely.

5. Because his honor erred, the facts of legitimacy and marriage being presumed under the circumstances of this case as developed in the evidence, in holding, that "the presumption of marriage after a great lapse of time is really not a presumption at all. It simply stands in lieu of proof, and a presumption in lieu of proof is not sufficient to make this witness' testimony competent."

6. Because his honor erred, legitimacy being presumed, and that presumption involving all the subsidiary facts leading thereto, in requiring proof of marriage as a condition precedent to admitting the mutual declarations of the parties themselves as to their marriage, and the legitimacy of their children.

7. Because his honor erred in excluding the questions asked the traverser as well as the answers thereto following, to wit: "Was or was not there any relation existing between the William Robb and Jean McFarlane Robb spoken of by you in your answers to the preceding question?" (Answer.) "Yes, they were husband and wife." Q. "How do you know the facts you have stated in the preceding answers?" A. "My father and mother told me so"—on the ground that they were "hearsay and incompetent," and because "Mrs. Muir is not competent to testify to any family relations between her father and mother."

8. Because his honor erred in affixing to the terms grandmother, grandfather, father, mother, brother, uncle, sister, &c., when used by the witnesses, the following explanation and qualification, to wit: that the words grandmother, grandfather,

&c., simply described the person, and did not establish any relation between them.

9. Because his honor erred in excluding the testimony of Mrs. Janet Drysdale, so far as it relates to the declaration of John Gentleman, her deceased husband, on the ground that "there was no blood relationship or affinity shown between William Robb 2d and John Gentleman."

10. That his honor erred in refusing to admit the testimony of the traverser, Mrs. Jean Robb Muir, as to the declarations of her mother, Jean McFarlane, deceased, made to her as to her pedigree, the existence of a family having been shown by the testimony of Mrs. Drysdale and Mary Gentleman; and further, because his honor erred in his reply to the question of Mr. Mordecai, after the admission of the testimony of Mrs. Drysdale and Mary Gentleman, to wit: "And your honor refuses to allow in the declaration of the traverser as to her pedigree?" "Yes, I see nothing to make me change my mind on that point."

11, 12, 13. That his honor erred in excluding the testimony of J. H. Happoldt, that William Robb 3d had said, "I have a sister and nieces in Utah, who will inherit my money."

14. That his honor erred in granting the non-suit herein, because a non-suit in a case of escheat is unprecedented and oppressive, especially when the question is one of relationship and whether the claimant is entitled under the will of her brother.

15. Because his honor held, that "there is no *proof* of marriage between William Robb and Jean McFarlane," and the question whether there was *proof* of marriage or not, is a question for a jury.

16. Because his honor held, "there is no evidence that they (William Robb and Jean McFarlane) lived together in that house (porter's lodge) in the sense of living together as man and wife;" whereas, there being evidence that they lived together *in a house* and that two children were born to them, together with the other circumstances of this case as developed by the evidence, the question whether there was a marriage or not was a question for a jury.

17. Because his honor held, "there was not sufficient *proof* upon which to base the presumption" (of legitimacy); whereas,

he should have held that the fact that William and Jean had
lived in the same house with Jean's parents, and two children
were born to them, the testator and traverser, both having been
recognized and treated by their parents and grandparents as
their own children and grandchildren, and seventy years having
elapsed and all the parties being dead, the presumption of
legitimacy did arise, and the question whether there was any
relationship between the traverser and the testator was a ques-
tion for the jury.

18. Because his honor held, "there is no *proof* in this case that
anybody has said that William Robb No. 2 and Jean McFarlane
sustained to each other the relation of man and wife, or that
they lived together holding themselves out as such;" whereas,
the question of proof is a question for the jury, there *being* evi-
dence that Jean McFarlane and William Robb both told the
traverser they were husband and wife, and both having lived
in the house of Jean McFarlane's parents as man and wife with
their son, William Robb 3d, the sufficiency of the proof is a
question for the jury.

19. Because his honor held, in his construction of the Dinkins
case, "that the person who was to be held as a lawful husband
admitted over his signature to a deed that the person to whom
it was supposed he was married was formerly *known to* be his
wife.   He admitted that, and upon that admission it was held,
that after a great lapse of time marriage would be presumed;"
whereas, this deed was introduced by the defendant to prove an
illicit intercourse between the two persons, and the court held
that the presumption was too strong to be rebutted by such
evidence.   There was not one tittle of evidence of marriage.

20. Because his honor held, that "the only thing that can be
presumed from the evidence before us is, that there had been
an illicit connection between them, and that they agreed that
that should be dissolved;" whereas, the presumption of an
illicit intercourse never arises, and whether the presumption
of marriage was rebutted, was a question for the jury.

21. Because his honor held, "there is nothing to show that
they ever held or recognized that relation (husband and wife)
as existing between them;" whereas, there is in evidence the

mutual declarations of both parties that they were husband and wife.

22. Because his honor held, that "counsel argued that the recognition of the children by the relatives is *proof of marriage*, and that the fact that affectionate relations were sustained between the parties themselves, is proof of marriage;" whereas, he should have held that the daily recognition by the parent of the child is a daily assertion of his legitimacy, and such was the position of traverser's counsel.

23. Because his honor held, "I cannot see any evidence of marriage in this case, and it is necessary *to establish the marriage* in order to entitle the claimant to recover;" whereas, he should have held, one of the issues only being relationship and *neither* issue being that of *marriage*, that claimant and traverser being *children of the same parents*, brought up as their legitimate children, and so treated by the grandparents, the presumption arose in favor of their relationship, and the question whether that had been rebutted is a question for the jury.

24. Because his honor held, "I don't think there is evidence to identify the person to whom the bequest is made in the will;" and further, "I hold that there has been no competent testimony offered on this subject;" whereas, the testimony is filled with assertions to the effect that the traverser and testator were brother and sister—children of the same parents; and the question of fact, whether the traverser was identified as one of the class held to be intended to take· under the will, was for the jury to determine.

*Messrs. Rutledge & Rutledge* and *Mordecai & Gadsden,* for appellant.

*Messrs. J. E. Burke* and *Barker, Gilliland & Fitzsimons,* contra.

November 21, 1892. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. Some time in September, 1885, one William Robb, late of the city of Charleston, departed this life, having first duly made and executed his last will and testament. By his will he disposes of his property as

follows: To his friend and former copartner, John Thomson, he gives all of his undivided interest in the real estate held by them as tenants in common, together with all his interest in the partnership property, for and during his natural life, and at his death he gives the remainder in such property, together with all other property of which he may die seized and possessed, "unto such person or persons, and in such shares or proportions, as they shall be entitled to the same under the laws of the State aforesaid relating to the distribution of the estates of intestates."

The escheator named in the title of this case, under the allegation that the said William Robb had died leaving no person who could lawfully claim his property either by descent or purchase, instituted proceedings for the escheat of said property, and in due time the appellant, Jean Robb Muir, traversed the inquisition of escheat, and this traverse came on to be tried before his honor, Judge Wallace, and a jury. After hearing such of the evidence introduced by the traverser, the appellant herein, as was held to be competent, a motion for a non-suit was made by the counsel for the escheator, which was granted, upon the ground that there was no evidence tending to show any lawful relationship between the said William Robb and the said Jean Robb Muir. From the judgment of non-suit the traverser appealed upon numerous grounds set out in the record, which we do not deem it necessary to state here, though they may be incorporated in the report of this case. These grounds raise four general questions: 1st. Whether the Circuit Judge erred in rejecting certain testimony, which will be more specifically mentioned, as incompetent. 2d. Whether there was any testimony tending to show that the said Jean Robb Muir was lawfully related to the said William Robb. 3d. If not, whether there was any testimony tending to show that said Jean Robb Muir was the person referred to by the general terms used in the will of William Robb. 4th. Whether in a proceeding like this a judgment of non-suit could, in any event, be properly rendered.

For a better understanding of these questions, it will be necessary to make a general statement of the facts which appellant

undertook to prove, and of the kind of testimony by which it was sought to make such proof. It seems that there were three persons spoken of in these proceedings, all bearing the same name of William Robb, and for the purpose of conveniently distinguishing them, they have been and will be designated by the addition to their names of the numbers 1, 2, and 3. The claim is that William Robb No. 1 was the paternal grandfather, and William Robb No. 2 was the father of William Robb No. 3, the testator who, it is claimed, was the brother of the appellant, Jean Robb Muir. It is also claimed that William Robb No. 3 and the appellant were the only children of William Robb No. 2 and Jean McFarlane, who was the daughter of James McFarlane and his wife, Mary; that William Robb No. 3 was born in the year 1819, or 1820, in the porter's lodge of Lord Abercrombie, in Scotland, while his alleged parents were living there with the said James McFarlane and his wife, he being then the keeper of the lodge; that upon the death of James McFarlane, Lord Abercrombie, desiring to appoint another keeper of his porter's lodge, allowed the widow of said James, with her daughter Jean, to occupy a small house near by, where, soon afterwards, the appellant was born, in the year 1822; that when this removal took place, William Robb No. 2 did not go with them, because the house was too small, but took William Robb No. 3 with him to his father's house, that of William Robb No. 1; that appellant was fourteen years of age when William Robb No. 1, at whose house she had visited, died; that she was married to her present husband, William S. Muir, in 1844, in Scotland, and soon after came to this country, finally settling in Utah, where she now resides.

When the appellant undertook to testify as to declarations made to her by her alleged parents in regard to the genealogy of the family to which she claimed to belong, her testimony was objected to, and the objection was sustained. The ground upon which this ruling was based seems to be that, before such testimony can be received, it must first be shown that the person whose declarations are sought to be proved was a member of the family to which such declarations relate; and here the judge thought that there was no such preliminary proof. His idea

seems to have been that the whole matter turned upon the question whether there was any sufficient evidence of the marriage of William Robb No. 2 and Jean McFarlane, and there being, in his judgment, no evidence of that fact, he excluded all declarations of William Robb No. 2 and Jean McFarlane.

The rule, as we understand it, is that while, in questions of pedigree, hearsay evidence may be admitted, yet it is subject to the following qualifications: the declarations sought to be proved must be those of a person related either by blood or marriage to the family to which the declarations refer, and that such relationship must be established *dehors* the declarations proposed to be proved; the declarant must be dead and the declarations must have been made *ante litem motam.* 1 Greenl. Evid., § 103, and cases there cited; 18 Am. & Eng. Enc. Law, 258–263, and the authorities there cited. These authorities also show that it is for the judge to decide whether the declarants were members of the family, so as to render their declarations admissible, while it is for the jury to determine the effect of such declarations upon the issue which they are called upon to try. The reason for this exception to the general rule with respect to hearsay evidence is that members of a family are supposed to have an interest in knowing and preserving the memory of their family relations, while strangers having no such interest, their declarations cannot be received.

It is very manifest from the very nature of things that, after a great lapse of time, the same strictness of proof should not be required either as to the admissibility or the effect of the declarations, as would be necessary to establish an ordinary contract. *Vowles* v. *Young*, 13 Ves., 143. "In cases of pedigree, therefore, recourse is had to a secondary sort of evidence, the best the nature of the subject will admit, establishing the descent from the only sources that can be had." In the case of *Johnson* v. *Johnson*, 1 DeSaus., 595, recognized and affirmed in *Dinkins* v. *Samuel*, 10 Rich., 66, the court said: "That the evidence of legitimacy was very slight, but that the court would presume a marriage after the lapse of thirty years, especially as all the parties were dead; and if a contrary presumption should prevail, it would have the effect of bastardizing a person after his

death, which would be contrary to every principle of law, justice, and equity." And the court added, that it "would act the more readily on the presumption, as there was no legal heir of William Johnson, sr., to contest the legitimacy of William Johnson, jr." See, also, the case of *Vaughn* v. *Rhodes,* 2 McCord, 227, which was an action brought by a mother against the defendant for taking away her daughter, about twelve years of age, in which one of the grounds of defense was that the child was an illegitimate. Several witnesses were allowed to testify that they understood that she was illegitimate, though they did not know the fact, because they were not acquainted with her mother. Another witness testified that, in early life, he *had heard* that the plaintiff was married to Vaughn, whose name she had taken and given to her daughter, but he never knew Vaughn, nor did he know the woman at that time. Although it appeared in evidence that the mother was a woman of ill fame, and had gone off and been absent from the State about a year, leaving her daughter in the family of the son of a man with whom the mother cohabited, and with whom she had gone away, yet the court held that the presumption was in favor of the legitimacy of the child.

Now, in this case, it appears that the appellant was permitted to testify, with the qualification that when she used the words grandfather, grandmother, father, mother, uncle, or aunt, they were to be regarded merely as a designation of the persons to whom she referred, and not as any evidence that they bore such a relation to her as those words would imply, to the following facts substantially, viz: that (her grandfather) William Robb No. 1 lived at Cause-Head, Scotland; that he is dead; that she frequently visited him at that place before his death, when he would treat her as his grandchild; that she called him "grandfather," and he spoke to and referred to her as his grandchild; that (her father) William Robb No. 2, as well as (her brother) William Robb No. 3, then lived with (her grandfather) William Robb No. 1; that (her brother) William Robb No. 3 was treated and spoken of by (her grandfather) William Robb No. 1 as his grandson, and that he addressed Robb No. 1 as his grandfather; that (her grandfather) Robb No. 1 would ask about (her mother)

Jean McFarlane, speaking kindly of her as his daughter-in-law; that Robb No. 1 was a religious man, an elder in Blair Logie kirk; that when Robb No. 1 died, she with (her brother) William Robb No. 3 attended his funeral as his grandchildren, she being then fourteen years of age; that (her father) William Robb No. 2 was a gun-smith, and his shop adjoined (her grandfather's) William Robb No. 1's house; that she went to school in Scotland, and (her father) William Robb No. 2 paid for her schooling; that when she used to pass (her father's) William Robb No. 2's shop, he would call her in, have her to write and read, to see how she was getting on at school; that she then wrote her name "Jean Robb;" that (her brother) William Robb No. 3 was sometimes present at these visits to the shop, and that they there addressed each other as brother and sister; that (her father) William Robb No. 2 would address them as son and daughter, and that she would address him as father; that he treated them both kindly as his children; that on these visits "he asked how my mother was;" that he visited (her mother) Jean McFarlane, when he treated her as his wife, and they when thus together treated her and (her brother) William Robb No. 3 kindly as their children; that the William Robb whose estate is now in controversy is the same person of whom she has been speaking as having known and associated with him in Scotland as her brother; that William Robb No. 3 was "brought up" and educated by William Robb No. 2, with whom he lived; that William Robb No. 3 left Scotland and came to America in the year 1847, with (his father) Willam Robb No. 2 and (aunt) Mary Robb; that said Mary Robb is dead; that William Robb No. 3 went by the name of William Robb when she knew him in Scotland, and that she went by the name of Jean Robb before her marriage with William S. Muir, which took place in 1844, and that soon after her marriage she came to this country, and finally settled in Utah, where she still resides; that while there she received a letter from (her brother) William Robb No. 3, in which, after inquiring about her health, he proposed to take her children and educate them in Charleston, South Carolina, from which place the letter purported to have been written. This offer to take the children, the witness said in her cross-

examination, was declined because her husband was able to school them himself. She also testified on her cross-examination that William Robb No. 1 owned the house in which he lived, and that upon his death it went to (her father) William Robb No. 2, who sold it before he went to America. The witness also testified that while she lived in Scotland she was acquainted with several persons, viż: Thomas McFarlane and James McFarlane, whom she recognized as her uncles, and Mary McFarlane, whom she recognized as her aunt, and that they recognized and treated her as their niece.

Mrs. Mary Gentleman testified that she was the daughter of Mary McFarlane, wife of Robert Gentleman, who was the sister of Jean McFarlane; that she knew William Robb No. 3, who was the son of her aunt, Jean McFarlane; that he was born about 1819, while his mother was living at the porter's lodge, with her parents, James McFarlane and wife, Mary Finlayson (the grandparents of witness); that William Robb No. 2 was always said to be the father of William Robb No. 3; that she never heard it mentioned in the family whether Jean McFarlane and William Robb No. 2 were married or not, and never heard that William Robb No. 3 and Jean Robb were illegitimate children; that William Robb No. 3 lived with witness about four years, and was in the habit of going to see his father and mother and staying from Saturday till Sunday evening; that William Robb No. 3 always recognized appellant as his sister, spent the night with her and her husband before they left Scotland for America, at the house of witness, and made his sister a small present; that subsequently William Robb No. 3 went with his father and Aunt Mary to America; that when he revisited Scotland about twelve years ago, he conversed with witness about his sister, speaking kindly of her, and saying that she was in Utah.

The next witness offered was J. H. Happoldt, who testified that he was very intimate with William Robb No. 3, and was in the habit of visiting him very frequently; and that upon the occasion of one of his visits, on a very hot night, he found said Robb at work, and chiding him for working so hard on such a hot night, saying that he had enough already; to which

he replied in these words: "Well, I have a sister and nieces in Utah, who will inherit my money." After this testimony was introduced, counsel for the escheator moved to strike it out, and the motion was granted, upon the ground that there being no misdescription in the will as to the persons who were to take, the testimony was inadmissible.

Mrs. Janet Drysdale, or Gentleman, was then examined, who testified that she was the widow of John Gentleman, a brother of Mrs. Mary Gentleman, previously examined; that she knew William Robb No. 3, but did not know his sister, Jean Robb, as she had left for America before she became acquainted with William Robb No. 3; that his mother's name was Jean McFarlane, a sister of her husband's mother; that William Robb No. 3 was introduced to her by her husband as his cousin; that upon his visit to Scotland, some sixteen years ago, he stayed with her about three weeks; that her husband corresponded with William Robb No. 3 regularly up to the time of his death; that he spoke very kindly of his sister in his letters; and that she never heard William Robb No. 3 and his sister, Jean Robb, spoken of in her husband's family as illegitimate children. After this testimony was in, counsel for appellant moved to admit the testimony of Mrs. Jean Robb Muir, as to the declarations of her mother and other of her alleged relatives, previously ruled out, because there was no proof of any family; but the motion was refused, because the Circuit Judge still thought there was no proof of any family.

It does seem to us that in view of all this testimony and of the principles of law laid down in the authorities above cited, that there was evidence tending to show that there was a family in Scotland of which Jean McFarlane was a member, and with which both the testator and the appellant were connected. This testimony certainly does tend to show that both William Robb No. 3 and the appellant, Jean Robb Muir, were the children of William Robb No. 2 and Jean McFarlane; that they were recognized and treated as such both by the Robbs and the McFarlanes; that they were called their children, which must be presumed to mean lawful children, as there is nothing to show that they were ever called or treated

as illegitimate children; we think, therefore, that the Circuit Judge erred in excluding the declarations of Jean McFarlane and other members of such family.

It is true, as we have said above, that it is for the judge to determine in the first instance the question whether the persons whose declarations are proposed to be offered in evidence were members of the family; but it seems to us that in this case the error lay in requiring stricter proof of that fact than the law requires. After such a lapse of time, nearly seventy years, it cannot be expected that such satisfactory proof can be obtained, as would be required in an ordinary case; especially where, as in this case, the events under investigation occurred in a foreign country, among people who appear to have occupied a lowly station. To insist upon strict proof of the marriage of William Robb No. 2 with Jean McFarlane, as seemed to be the controlling idea in the mind of the Circuit Judge, is more than the law requires. In such a case as this, much must necessarily be left to presumptions drawn from the circumstances testified to, which, of course, are liable to be rebutted by other facts and circumstances appearing in the testimony. Even if there was a want of any testimony to prove the marriage of William Robb No. 2 and Jean McFarlane, in any of the modes recognized by the law, yet that is not, necessarily, conclusive of the question of legitimacy, which is the only issue here; for, as was held in *Johnson* v. *Johnson*, 1 DeSaus., 595, *supra*, that will be presumed upon slight proof, after the lapse of thirty years, especially where all the parties are dead. And in *Vaughn* v. *Rhodes*, 2 McCord, 227, *supra*, the legitimacy of the child was presumed, although there was not only no legal proof of the marriage of the parents, but there was evidence that the child was understood to be illegitimate, and the mother was shown to be a person of ill fame.

Indeed, we think, after such a lapse of time as has occurred in this case, where the parties are dead, and where the evidence shows that a person is the child of a certain man and woman, and has been recognized and treated as such, not only by the father and mother, but also by the different members of the families of both father and mother, legitimacy

may be presumed, even though there is no evidence of the marriage of the father and mother; but, of course, such presumption may be rebutted by other facts appearing in the testimony. In support of these views, we refer to *Strode* v. *McGowan*, 2 Bush (Ky.), 621; 1 Bish. Mar. & Div., §§ 1160–1164, edit. of 1891; *Monkton* v. *Attorney General*, 2 Russ. & Myl., 157; *Sitler* v. *Gehr*, 105 Penn. St., 577; reported also in 51 Am. Rep., 207.

As to the rejection of the testimony of Happoldt, we think the court below erred upon two grounds: 1st. Because it tended to show an admission by the testator that the appellant was his sister—meaning, of course, his lawful sister—and as such was competent. *Wise* v. *Wynn*, 59 Miss., 588; reported also in 42 Am. Rep., 381, where it was held that the declarations of a deceased person that he had a brother living at a certain place, are competent to establish the right of the brother's children to inherit from the declarant. To same effect see *Moffit* v. *Witherspoon*, 10 Ired., 185; see, also, *Shields* v. *Boucher*, 1 DeG. & Sm., 40. 2d. Because, taking the view that both testator and appellant were illegitimate, and, therefore, incapable of inheriting the one from the other, the testimony rejected tended to show who were the persons referred to in his will, in general terms, that the testator really meant by the descriptive terms used. As was said in *Wish* v. *Kershaw*, Bail. Eq., 353, note: "If a testator devises his estate to a person, or class of persons, by name or description, and it turns out that there is no one to whom the description properly applies, parol evidence may be admissible to show to whom the testator intended it to be applied." Now, in this case the testator has designated the objects of his bounty—not by name, but by terms descriptive of a class of persons; and as there is (under the supposition of illegitimacy) no person who could bring himself within the class designated, and never can be, inasmuch as the testator died leaving no issue, parol evidence is competent to show whom he intended by the terms which he used. See, also, *Wilkinson* v. *Adam*, 1 Ves. & B., 422; *Powers* v. *McEachern*, 7 S. C., 290.

We think, therefore, that there was error in rejecting the testimony hereinbefore referred to, as well as in granting the non-suit.

Under these views, the remaining inquiry, whether a non-suit can properly be granted in a proceeding of this kind, becomes of no practical importance in this case. But as it is an important question of practice, we, perhaps, ought to express our views. While it is true that the authorities elsewhere, cited by counsel for respondent, do seem to show that a non-suit may be granted in a proceeding of this kind, yet, as we have no authority in this State upon the subject, so far as we are informed, we are not inclined to accept that view. It seems to us that it would be subversive of one of the main objects of the proceedings in escheat, which is to have a *final* determination of the issue presented by the traverse of the inquisition; and this a non-suit would not effect. We think, therefore, that in all such cases there should be a verdict of a jury *finally* determining the issues of fact raised by the traverse.

The judgment of this court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for a new trial.