**CHARLES S. CONE, et al. v. LOTTIE K. BENJAMIN, et al.**

27 So. (2nd) 90                                          January Term, 1946
July 26, 1946                                                      Division B

*James H. Finch, Tage Joranson, Harry H. Wells* and *Edward Schatz,* for appellants.

*Carey & Harrison, Joe W. Davis* and *Harold G. Davis,* for appellees.

BROWN, J.:

On January 28, 1931, Harrison J. Stewart and Ada Cone Stewart, his wife, an aged and childless couple, who had been residents of St. Petersburg, Florida, for some twenty years, lost their lives in that city as a result of a collision between an automobile in which they were riding and a train. Both died on the day of the collision, but the husband died about an hour prior to the death of his wife. Each of them left a will giving to the other all of his or her estate. Both wills were duly probated.

Soon thereafter the County Judge of Pinellas County appointed Roy L. Benjamin as administrator with the will annexed of the estates of each of the deceased persons, and he

duly qualified as such. The estate of Harrison J. Stewart consisted mostly of personal property, stocks, bonds, mortgages, etc., which the administrator's inventory showed amounted to $47,803.13, and some real estate of the value of $10,000, or more. The inventory of Ada Cone Stewart's estate showed no assets discovered. Notice to creditors, legatees, distributees, etc., was duly published for eight weeks, and proof of publication filed, as required by Sections 5597-5598 C. G. L. of 1927.

On February 15, 1932, Roy L. Benjamin, as administrator c. t. a. of the estate of Harrison J. Stewart, filed a bill of complaint in the Circuit Court of Pinellas County, entitled "A bill for instructions to administrator," against himself, as administrator of Ada Cone Stewart's estate, the New England Life Insurance Company, and unknown heirs of Ada Cone Stewart. The purpose of the bill was to determine which of the decedents died first, and who were the proper heirs and beneficiaries to receive the assets of the two estates. The bill alleged that several named persons had been ascertained to be the heirs of Harrison J. Stewart, to-wit, one brother, three sisters, and the children of deceased sisters; that plaintiff had made diligent search and inquiry for any heirs of Ada Cone Stewart, but was unable to locate or discover any such; that he believed that some there were or might be; and the unknown heirs of Ada Cone Stewart were made parties defendant to the bill to the end that they might answer the same. An administrator ad litem was appointed by the chancellor to represent the estate of Ada Cone Stewart and a guardian ad litem was appointed to represent all unknown parties who were her proper heirs, and each of the persons so apointed filed appropriate answers and demanded strict proof of the allegations of the bill.

In such chancery suit, service by publication was ordered and was undertaken to be procured on the unknown heirs of Ada Cone Stewart, but none appeared personally or by attorney, and a decree pro confesso was entered against them. The order for publication, (omitting the style of the case, the name of the court, the signature of the clerk, etc.) was dated February 17, 1932, and read as follows:

"It appearing by affidavit filed in the above stated cause that affiant has made diligent search and inquiry for the whereabouts of any heirs of Ada Cone Stewart (also known as Ada C. Stewart) deceased, and is unable to locate any such heirs, but is informed and believes that there are, or might be heirs of the said decedent whose names, ages, addresses and places of residence are unknown, who claim some interest in the subject matter and property described in the Bill filed herein by virtue of such heirship, the defendants therein named, that there is no one in the State of Florida service of subpoena upon whom would be binding upon said unknown defendants; it is therefore ordered that said unknown defendants be and they are hereby required to appear to the bill of complaint filed in said cause on or before Monday, the 4th day of April, A. D. 1932, otherwise the allegations of said bill will be taken as confessed by said defendants."

The testimony of several ladies, who had been personal friends and neighbors of Mrs. Stewart, in St. Petersburg, was taken in the chancery suit. They testified that they had known Mrs. Stewart quite intimately for some nineteen or twenty years and that she told them that she had no living relatives, and that, as she told one of them she was "the last of her line;" that she and Mr. Stewart had had one child who had died in early childhood, and that she, Mrs. Stewart, had no relatives at all. There was also testimony as to when and how Mr. and Mrs. Stewart had been injured and a physician testified as to the times of their respective deaths.

Final decree was filed May 9, 1932. The chancellor found that the court had jurisdiction of the parties and the subject matter; the decree pro confesso against the unknown heirs of Ada Cone Stewart was confirmed; that Harrison J. Stewart died on January 28, 1931, at 5:30 P. M., and that all of his property passed under his will to Ada Cone Stewart, who died on the same day at 6:30 P. M.; that at the time of her death Ada Cone Stewart had no living children, father, mother, brothers or sisters, or their descendants, nor any paternal or maternal kindred or living relatives, and that her said husband had predeceased her; but that at the time of her death there were living heirs and kindred of her deceased husband, Har-

rison J. Stewart; that under Section 5485 C. G. L., Fla. 1927, all of Ada Cone Stewart's property shall go to the kindred of her husband, Harrison J. Stewart, in like course as if said husband had survived the said Ada Cone Stewart·and had then died entitled to the estate, and that the heirs of Harrison J. Stewart "do receive the same" under the proper administration of the estate of said Ada Cone Stewart deceased.

No appeal was taken from this decree, and the administration of the two estates proceeded under the supervision and orders of the Probate Court of Pinellas County and distribution of the assets (corporation stocks and cash) was made to the fourteen heirs of Harrison J. Stewart, by the County Judge's order, pursuant to the Circuit Court's decree above referred to. One of these heirs was Lottie K. Benjamin, a niece of H. J. Stewart, who received $1250.00 in money and four shares of stock.

After he had filed his final reports and his applications for discharge late in 1934, but before his application for discharge as administrator of Ada Cone Stewart's estate had been acted upon by the County Judge, Roy L. Benjamin died on January 12, 1935, and thereafter his widow, Mrs. Lottie K. Benjamin, was appointed and qualified as admistratrix c. t. a., de bonis non, of the estate of Ada C. Stewart, and Joseph W. Davis was appointed administrator c. t. a., de bonis non of Harrison J. Stewart's estate. On November 25, 1935, after due approval of his final report, Joseph W. Davis was discharged as such administrator of Harrison J. Stewart's estate, and on September 19, 1936, after approval of her final report, Lottie K. Benjamin was discharged as such administratrix c. t. a., de bonis non of Ada Cone Stewart's estate. In each of these orders of discharge the sureties on the respective administrative bonds were also discharged and letters of dismissal were granted. The Probate Court, in its orders of discharge, stated that the estates had been regularly and honestly administered. Thus the administration of these two estates was fully completed and closed on September 19, 1936.

Eleven months later, on August 19, 1937, a bill of complaint was filed in the Circuit court of Pinellas County, which

bill named Charles S. Cone and twelve others as plaintiffs, who alleged that they were the heirs of Ada Cone Stewart, the defendants therein named being the above mentioned administrators of the estate of Harrison J. Stewart and Ada Cone Stewart, and the sureties of their respective administrative bonds, and the fourteen distributees, who were the heirs of Harrison J. Stewart, who had received the assets of the two estates. Some nine named persons were made defendants who were alleged to be other heirs of the deceased Mrs. Stewart but who had not joined in the suit, "and all other parties claiming interests under Ada Cone Stewart, deceased, or otherwise." The purpose of the bill was to secure possession of the assets which, nearly two years before, had been distributed through the administrative proceedings on the estate of Ada Cone Stewart, above outlined, and the real estate as well.

On August 17, 1938, the plaintiffs in the original bill of complaint, filed an "amended bill of complaint in the nature of a bill of review" against the said distributees and the sureties on the bonds of the administrators in the probate proceedings above referred to. The bill alleged that the decree in the chancery suit was void as to these plaintiffs, because the chancery court had never obtained jurisdiction of them, and that the orders of distribution made by the probate court, based upon the chancery decree, were likewise void. The amended bill alleged that "not until within three months of the filing of the original bill of complaint herein did the plaintiffs herein, or any of them, have any notice or knowledge whatsoever of the death of either Ada or Harrison, or that these plaintiffs or either of them were and are heirs of Ada, or of the proceedings aforementioned," and that by the exercise of reasonable diligence they could not have sooner learned of said events or proceedings.

It was also alleged that the said administrators, with notice or knowledge of the facts, had made false and fraudulent representations to the County Court and the Circuit Court, and hence were without right to obtain constructive service by publication on these plaintiffs, but on final hearing sometime thereafter these charges of fraud were in open court

expressly withdrawn by Attorney James H. Finch who later was employed to represent the plaintiffs.

The prayer of this bill was quite similar to that of the original bill, and also prayed that the sureties on the administrative bonds be held liable to these plaintiffs. Ellison R. Stetson and wife, against whom plaintiffs had brought ejectment to recover certain real estate (which had been administered and distributed in the probate proceedings, and which had thereafter been purchased by the Stetsons from one Jones who had taken title from and held the same for the heirs of Harrison J. Stewart) petitioned the court to be allowed to intervene in the cause. The petition was allowed, the Stetsons made parties defendant and the ejectment suit enjoined.

On December 20, 1939, said plaintiffs filed a third bill entitled "Second Amended bill of complaint in the nature of a bill of review." It was on this bill, which was more thorough and comprehensive in its drafting, and the answers of the several defendants thereto, that the case finally went to trial.

This second amended bill contains all the allegations of the amended bill, and included a detailed history of the proceedings in the probate court, and attached as exhibits copies of the entire record of the administration. It alleges that there was never submitted to the probate court in either estate the question of whom the property of Ada's estate should be distributed to; that there was no adjudication by that court of the rights to the property as between the heirs of the wife, on the one side, and the heirs of the husband on the other; that one of the reports of the administrator made mention to the probate court of the decree in said chancery suit, and that the distributions made by the administrators were in obvious reliance on the decree in the chancery suit, entered May 9, 1932; that all of Ada C. Stewart's property which she had inherited from her husband, and all property of which she died seized or possessed, passed to her heirs at law, including the thirteen plaintiffs and the nine heirs who were made parties defendant; that she, Ada, did not die without heirs, as was alleged in the bill and decided by the chancellor in said chancery suit; that all property of her estate, not lawfully or

irrecoverably disposed of, including two dwellings and one vacant lot in Pinellas County, and $8000.00 worth of stock in the Commonwealth Edison Company, belongs to Ada's heirs.

The bill prayed that all of the property of Ada Cone Stewart's estate which may be reached or recovered (describing it) be adjudged the property of her heirs, the thirteen plaintiffs and nine defendants, and their respective shares determined; that the final decree in said chancery suit, holding that Ada died without heirs, and that her estate be distributed to her deceased husband's heirs, be set aside and adjudged void; that all orders of distribution made by the probate court be likewise adjudged void and set aside; that the defendants who have received rents and profits from the real estate and corporate stocks be required to account to Ada's heirs; that the conveyance made by Harrison J. Stewart's heirs to Jones, and by him to Stetson and wife, be set aside and cancelled; that a partition of all the property be made, and that a receiver be appointed for the real estate, and that the defendants be enjoined from selling, incumbering or disposing of any of the stock received by them. (This injunction pendente lite was granted upon the posting of bond by plaintiffs.)

This case has been twice before this Court prior to the present appeal. On its first appearance here the appellants, who alleged that they were heirs of Ada Cone Stewart, sought review by certiorari of an order of the chancellor dismissing their first amended bill in so far as it sought to recover against the sureties on certain administrative bonds. This court upheld the order and certiorari was denied. Cone v. Benjamin, 145 Fla. 22, 199 So. 927. In the second amended bill, above referred to, plaintiffs, among other things, attacked the validity of the appointments of the administrators of the estates of Ada Cone Stewart and of Harrison J. Stewart, respectively, and sought to hold them liable as administrators de son tort, and also sought to hold their sureties liable upon that theory. A receiver for certain real estate was also prayed for. The chancellor held that neither the administrators nor their sureties were liable, and on motions duly filed dismissed the second amended bill as to both. On review here, this court declined to disturb this order, but did direct the

Circuit Court to enter an order appointing a receiver of the described real property. See Cone et al. v. Benjamin et al., 150 Fla. 419, 8 So. (2nd) 476, wherein the history of this case up to that point is well set forth by Mr. Justice CHAPMAN who wrote the Court's opinion.

So the net effect of our holdings on these prior appeals is that neither of the first or second amended bills showed any liability or lack of diligence on the part of the administrators or the sureties on their bonds. Their honesty and diligence is reflected by the record. It follows that the pending litigation was reduced to a contest over the assets of the estate between the alleged heirs of Ada Cone Stewart and those relatives of her deceased husband whom the Circuit Court and the Probate Court had held to be her legal heirs some time before this litigation was begun, and from which adjudications no appeals were taken. Most of the assets of the estate consisted of personal property, which was distributed according to the orders of the probate court. The administration of the estate was governed by the law as it existed before the Probate Act of 1933 was adopted. As there were no debts against the estate, the administrators were not concerned with and did not take title to the real estate, but it was important for them to ascertain the heirs to whom the personal property should be distributed. Not being able to find any heirs of Ada Cone Stewart, the original administrator sought the aid and judgment of the chancery court before making distribution of the personal property, as shown above.

The answers of the defendants admitted some of the allegations of the second amended bill, but denied the allegations of the bill as last amended which attacked the jurisdiction of the County Judge's Court to make the orders of distribution above referred to, and the jurisdiction of the Circuit Court to render said decree ascertaining who were the heirs to whom distribution of the property of the estate should be made, alleging that the action taken by both courts throughout was clearly within their jurisdiction and entirely regular and valid, and that the administrative proceedings were completely closed long before the present suit was instituted. The defendants also denied the allegations of the second amended

bill that the thirteen plaintiffs and nine other named persons (who did not join in the bill) were the heirs of Ada C. Stewart, or entitled to any part of said estate. Defendants also denied that the plaintiffs had no knowledge of the deaths of Harrison and Ada Stewart until within three months of the filing of their original bill, and alleged that some of the plaintiffs had actual notice thereof about a year prior thereto, and that all of them had constructive notice of the probate proceedings in the estates of said decedents, and of the chancery proceedings; that after the deaths of Harrison and Ada Stewart, the administrator had exercised due diligence in an effort to ascertain whether Ada C. Stewart had left any relatives or next of kin, but found that she had left none.

As neither of the Stewarts left any unpaid debts, and as the personal property of the estate of Harrison Stewart, which on his death became the property of his wife, was more than ample to pay the funeral expenses and costs of administration, the administrator of neither estate had any title or interest in or power over the disposition of the real estate under the law as it existed at the time of the deaths of these parties, or at the time the administrator filed his bill in the Circuit Court "for instructions," etc. See Section 5629 et seq., Comp. Gen. Laws of 1927. So the administrator was not primarily concerned with the problem of who were the heirs who should inherit the real estate. However, under the statute, the proper distributees of the personal property had to be the same persons who were entitled to inherit the realty. But Roy L. Benjamin, who was the administrator of both estates, was deeply concerned with an adjudication of the question as to which of the parties died first, and the further question as to whom the personal property of the estates should lawfully be distributed by him. That, too, was controlled by the same statute of descent. He knew who the heirs of Harrison Stewart were and named them in the bill; they were near relatives, and that question was easily answered. But he also knew that if Ada Cone Stewart left any heirs, and they could be found, the distribution of the personal property of her estate should be made to them, and they would, as a matter of law, inherit the real estate also. Not being able to ascertain

whether Ada C. Stewart left any heirs, about one year after qualifying as administrator he sought the aid of a court of equity as above referred to. Order of publication was made and published, as above set forth in full. Whether or not this bill presented a justiciable question, and if so, whether or not the order of publication was legally sufficient, which questions we will presently discuss, the filing of this bill indicated an honest effort on the part of the administrator to ascertain whether or not the deceased Mrs. Stewart left any heirs, and to obtain and follow the instructions of a court of equity as to his duty in the premises.

Was any justiciable question presented by this bill? In so far as it concerned the question of to whom the personal property of the estate should be distributed, we think there was a justiciable question and that there was equity in the bill. In this connection we must not overlook the fact that Section 11 of Article V of the Constitution vests the Circuit Courts with "supervision and appellate jurisdiction of matters arising before county judges pertaining to their probate jurisdiction." It is true that at the time the bill was filed no application had been made to the County Judge to pass on the question of who the proper distributees of the personal property were, but this question was potentially before him, and was bound to arise presently. When it did, the County Judge ordered the distribution of the personalty to be made to the heirs of Harrison J. Stewart, pursuant to the chancellor's decree. Under the peculiar circumstances of this case, we are of the opinion that the administrator had the right to file a bill to invoke the supervisory powers of the Circuit Court, provided that it was with reference to a matter which concerned the administrator's duties which it was within the jurisdiction of the Circuit Court to adjudicate, and provided further that such action was based upon a legally sufficient order of publication to the unknown heirs of Mrs. Stewart, which order was duly published as required by law.

Our view is that the decree in the chancery suit, in so far as it *directly* affected the real estate, or any right or title therein, was void, because the complainant administrator, who invoked the jurisdiction of the court, had no right, title or

interest in the real estate, nor any duty to perform with reference thereto. See 39 Am. Jur. 858-863; Lovett v. Lovett, 93 Fla. 611, 112 So. 768. But the chancellor's decree, in so far as the personal property of the estate was concerned, and the adjudication made therein as to the persons to whom it should lawfully be distributed, was valid and binding *if* the order of publication to the unknown heirs of Ada Cone Stewart was lawfully made. That such order was duly published is not denied. It must also be admitted that the adjudication by the chancellor that certain persons were the lawful heirs and therefore entitled to receive the personal property of the estate, necessarily "affected" the title to the real estate, for the reasons above pointed out; i. e., that the persons adjudicated to be the heirs of Ada Cone Stewart and therefore entitled to the distribution of the personal property of the estate, necessarily, as a matter of law, had to be the heirs who were entitled to inherit the real estate also. But for the reasons pointed out, the decree was not res judicata as to the realty or the interests therein. So the sufficiency *vel non* of the order of publication is important, both as to its direct and its possible indirect effects.

The statute then in effect authorizing the prosecution of suits against persons unknown, Section 4897, C. G. L., was made applicable to various classes of suits, including suits in chancery for quieting title to, or removing a cloud from, real estate, or "for the administration of the estate of a decedent," or "other suit in chancery relating to or affecting the title to real estate." The suit filed by the administrator not only related to the "administration of the estate of a decedent," but also purportedly *affected* the title to the real estate described in the bill which belonged to Ada Cone Stewart at the time of her death, for the reasons above pointed out. So the chancery suit filed by the administrator did present a justiciable question, at least as to whom the personal property of the estate should be distributed. And the suit was one of the classes of suits authorized by Section 4897 C. G. L. See Fowler v. Chillingworth, 94 Fla. 1, 113 So. 667, h. n. 4.

Appellants main attack upon the validity of the decree in said chancery suit is based upon the contention that there was

no proper predicate alleged in the bill for the order of publication, and that the order itself was defective, and that the final decree was therefore null and void.

The bill alleged that Harrison J. and Ada Cone Stewart were the owners of certain real estate, describing it, and that Harrison J. Stewart, at the time of his death was also the owner of various stocks, bonds and cash and a policy of life insurance in the sum of $1500., issued by the New England Mutual Life Insurance Company payable to his said wife if she survived him, otherwise to his executors or administrators, and inasmuch as plaintiff administrator was unable to prove which died first the insurance company had refused to pay the proceeds of the policy to plaintiff as administrator c. t. a. of either estate; that the said decedents died without issue; that plaintiff had made diligent search and inquiry for any heirs of said Ada Cone Stewart, but was unable to locate or discover any such heirs, "but believes that there are or might be," and that "therefore the unknown heirs of Ada Cone Stewart, deceased, are made parties defendant hereto, to the end that they might answer or interplead and be bound by the decree of this court." That plaintiff has no adequate remedy at law, and cannot safely make any distribution of said assets without risk. That plaintiff claims no interest in said estate except to properly perform his duties as administrator. The bill was duly sworn to. It prayed that all the defendants be required to answer this bill and that they be allowed to interplead, one with the other, if necessary.

The statute then in force, said Section 4897 C.G.L., provides that if the complainant in any of the classes of suits named, shall state in a sworn bill that he believes that there is a person, or are persons, interested in the property involved in such suit whose name or names are unknown to him, and shall pray for relief against them in such bill, he shall be entitled to process by publication to bring in such persons as parties defendant to such suit. The statute then goes on to say: "If the said unknown persons shall be known to, or believed by the complaint, to be the heirs, devisees, grantees, or other claimants under a person deceased whose name is known to the complainant, the complainant shall state the name of

such person in the bill, but the failure to so state shall not invalidate any decree obtained by complainant in such suit."

This statute is much broader in its terms than Chapter 5393, Acts of 1905, and the cases cited applying to the older statute are not controlling here; such for instance as the case of Cobb v. Hawsey, 56 Fla. 159, 47 So. 484. The case of Wilson v. Drumright, 87 Fla. 202, 99 So. 553, though dealing with the latter act, is not in point on the facts. Nor is Brecht v. Bur-Ne, 91 Fla. 345, 108 So. 173, in the way. That was a suit to quiet title. In the opinion it was said that the statute did not authorize suits against "unknown persons claiming unknown interests." Here the bill shows that the unknown persons were the heirs of Ada Cone Stewart—if there were any such heirs—and the bill alleged that complainant believed there were or might be such heirs, though after diligent inquiry he had not been able to locate them. If there were such the bill shows what their interest in the property was. Nor do we find that the case of Peters v. Ten Eyck Corporation, 125 Fla. 388, 169 So. 865, is in conflict with our holding in the case at bar.

Counsel for appellant contend that the allegations of the bill did not meet the requirements of said statute because the bill did not allege (1) that plaintiff "believes there is a person, or are persons, interested in the property involved in such suit;" (2) does not allege that their names are unknown to complainant, and (3) does not pray for relief against them in such bill. When all the provisions of the statute above referred to are taken into consideration, we hardly think these contentions, made on a collateral attack, are sufficient to authorize us to hold that no statutory basis was shown by the sworn bill for the constructive service intended to be afforded by the statute. In Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, this court said:

"The weight of authority is to the effect that if an affidavit for constructive service is defective but nevertheless tends to show each material statutory fact necessary to be shown to make valid constructive service, and there is not an entire omission to state any required material fact, but such material fact is only inferentially or insufficiently set forth, the pro-

ceedings upon such defective affidavit are merely voidable, not void, and are not subject to being struck down upon collateral attack."

The relief prayed was that the unknown defendants come in and plead to the bill, the inference being that if they came into court and showed by sufficient evidence that they were the heirs of Mrs. Stewart and had an interest in the property described in the bill, and if such evidence was not successfully rebutted, they would enable the Court and the administrator to give them their just deserts and enable the administrator to make proper distribution of the estate, or at least of the personal property which formed the bulk of the estate, and that if they failed to appear in the case, the property would be ordered distributed to the known heirs of Harrison Stewart. This was a reasonable and necessary implication from the facts specifically alleged; especially so on collateral attack.

Now as to the contention that the bill in the chancery suit does not say that plaintiff "believes that there is a person or are persons interested in the property involved in such suit," and does not say that "their names are unknown to complainant," as required by the statute. Sec. 4897 C.G.L.

As above shown, the bill, which made the insurance company and "the unknown heirs of Ada Cone Stewart" parties defendant, alleged the deaths of the two Stewarts without issue, and the uncertainty as to which died first; that they were the owners of four parcels of real estate, each of which was fully described, and that Harrison J. Stewart at the time of his death also owned "various stocks, bonds and cash," and a life insurance policy in a certain sum in a named insurance company. (The inventory of the personal property which had been filed in the county judge's court by the administrator was quite lengthy, and to copy the same in the bill was unnecessary.) That the heirs of Harrison Stewart had been ascertained and were named in the bill; that plaintiff had made diligent search and inquiry for any heirs of Ada Cone Stewart, but was unable to locate or discover any such heirs, but that he "believes there are or might be," and prayed that such unknown heirs of Ada Cone Stewart be made parties defendant, etc. Our conclusion is that these allegations show that the

statutory requirements above set forth were substantially complied with, and, on this collateral attack, formed a sufficient basis for the order of publication, which order was duly published.

But appellants contend that the order of publication, set forth earlier in this opinion, was itself fatally defective and not in compliance with Section 4898 C.G.L., which appellants contend is the governing statute, for the reason, among others, that the property was not "briefly but definitely described." Section 4898 C.G.L. requires the order of publication to "briefly but definitely" describe the "property." We have held that this statutory requirement applied in cases dealing with real estate, and as personal property is also "property" we hold that it also applied to personal property. Therefore the order of publication was defective in this particular and the decree rendered thereon was not, and is not, binding or effective against these appellants.

An illegal order of a County Judge sitting as a probate Court can be set aside as invalid on proper bill in equity. See Pitts v. Pitts, 120 Fla. 363, 162 So. 708.

We agree with appellants that the decree in the "chancery suit" was not a declaratory decree such as was authorized by the declaratory judgments statute then in effect, sections 9953 and 9954 C.G.L., as construed in Sheldon v. Powell, 99 Fla. 782, 128 So. 258. This is made plain by the sixth headnote to the opinion in Sheldon v. Powell.

For the reason above pointed out, we hold that, under Section 4898 C.G.L. of 1927, the said chancery decree was ineffective as against these appellants insofar as it authorized the administrator, under the supervisor and director of the County Judge, to distribute the personal property to the known heirs of the husband, and that it was wholly without effect on the title to the real estate. Whether the title to the real estate and the right to be the distributees of the personal property became vested in the husband's heirs upon the death of Ada Cone Stewart, or in the appellants in the present suit, who allege that they were and are the true heirs of Ada Cone Stewart, and are not estopped to claim such title, are the questions which we will now consider.

We come now to the evidence relied on by appellants to prove heirship. None of the twenty two persons, whom the appellants' bill alleged to be the heirs of Ada Cone Stewart, appeared in court or testified in this case. Nine of them declined to join as plaintiffs in the suit, and were made defendants. Counsel for appellants sought to prove such heirship by offering in evidence a book, written and published by one William Whitney Cone of Brandsville, Mo., in 1903, which purported to give a history of the Cone family in America, wherein the names of Ada Cone Stewart, and some 6,567 other persons, appears, and by offering the testimony of several witnesses in an effort to prove that Mrs. Stewart was a cousin of, or related to, the author, the theory being that this rendered the book admissible in evidence as a written declaration made by "a member of the family."

"The rule is that declarations of deceased persons who were *de jure* related by blood or marriage to the family in question may be given in evidence in matters of pedigree. (Citing authorities.) A qualification of the rule is that before a declaration can be admitted in evidence, the relationship of the declarant with the family must be established by some proof independent of the declaration itself." Fulkerson v. Holmes, 117 U.S. 389, 6 C.S. 780, 29 L. ed. 915. The opinion in this leading case also says: "this exception (to the rule against hearsay) has been recognized on the ground of necessity; for, as in inquiries respecting relationship or descent, facts must often be proven which occurred many years before the trial, and were known to but few persons, it is obvious that the strict enforcement in such cases of the rules against hearsay evidence would frequently occasion a failure of justice. Taylor, Evidence, Sec. 635. Traditional evidence is, therefore admissible.

"The rule of admission is accordingly restricted to the declarations of deceased persons who were related by blood or marriage to the person whose pedigree is in issue, and therefore to the declarations of declarants interested in the succession in question. . . . The declaration of friends, servants and neighbors might not be received, but the rule is now declared by nearly all the authorities that the declarations are

confined to those made by legal relatives. So far as blood relatives are concerned, the law does not seem to have limited the inquiry within any particular degree of relationship, although the declarations of very remote relatives might be entitled to very little weight." Jones on Evidence, 2nd ed., Section 1132.

To like effect, see Jones on Evidence, 4th ed., Sec. 312, wherein it is said: "Although there is some conflict in the cases, the weight of authority seems to be that, while a declarant must be shown by evidence aliunde to belong to the family, it does not appear to be necessary to show that he belonged to the same branch of it."

Three cases are cited in support of paragraph just quoted. One of them does not, as we read it, deal with the exact question. The other two do. In re Robb's estate, 39 S.C. 19, 16 S.E. 241, holds that the declarations must be those of a deceased person related by blood or marriage to the family to which the declarations refer, and must have been *ante litem motam*. In the second case, Sitler v. Gehr, 105 Pa. St. 577, 51 Am. Rep. 205, the opinion says: "The whole question is thus summed up by Mr. Wharton in his work on Evidence, p. 116: 'Declarations as to a family, in order to be received, must emanate from deceased persons connected with such family by blood or marriage.' " The opinions in both these cases are very able and thorough, but they dealt with declarations of persons who were members of or closely related to the family about which the declarations were made. The general rule as stated in most text books is much the same as that above quoted from Jones on Evidence. See 20 Am. Jur. 409 et seq., anq., and 31 C.J. 976 et seq.

Now, as to the evidence of the relationship vel non of William Whitney Cone to the deceased Mrs. Stewart, as shown by the transcript; that is, does the evidence show that declarant belonged to the same family, or some branch of that family.

Mrs. Isabelle C. Harvey testified that she was the daughter of William Whitney Cone, of Brandsville, Mo., who died in 1924, and that her mother, Orrinda Lamphere Cone, died the following year. Her father was the author of the book, en-

titled "Some account of the Cone Family in America," and worked on it for some fifteen to twenty years. Her father's father was Benjamin Bishop Cone, of Pittsford, N. Y. That her father had two sisters, Mary Ann Cone and Sarah Cone Finkle, both deceased, and his mother's name was Lucy Whitney Cone. This information she received from her mother. She did not know Ada Cone Stewart, or her father, Albert Cone. In answer to a question as to whether her mother had made a statement that her husband was related by blood to the members of the Cone family, Mrs. Harvey answered: "No, he was a Cone. She mentioned his sisters and his mother and father. As I say, those were the only ones she ever talked about. I haven't heard her discuss any farther back than that at all. She relied on my father for that." Further, on direct examination she was asked whether or not she knew that her father was related by blood to the Cone family as reported in his book, from what her mother had told her, and she answered, "Yes, he was." But on cross examination, when asked the question whether she knew that of her own knowledge, she answered, "No, I do not." Previously in her testimony on direct, she was asked: "Did your mother ever discuss with you, or with other members of the family in your presence, the history of your father's family?" And her answer was, "only about those of the immediate family that she had known, her mother-in-law, and of course mentioned her father-in-law, but not of her personal knowledge, and her sisters-in-law, my father's sisters."

The testimony of Randall C. Harvey adds little, if anything, to that of his mother, above reviewed. Neither of them testified that William Whitney Cone was related to Ada Stewart. Nor did the testimony of George A. Root shed any light on this question.

Witness Harry Hamill, an elderly Chicago lawyer, chief counsel for the appellants, testified that he had known Ada Cone Stewart and her husband, Harrison J. Stewart, since 1893; that they all worked out at the stockyards in those early days and became well acquainted, and that he also knew her parents. That Ada Cone Stewart told him, in 1905, that she had a distant relative named William Whitney Cone, out in

Missouri, who had written a book on the Cone family in America, which showed her relations on her father's side only, and that she had no brothers or sisters, and no relatives on her father's side that she knew of; that she showed him this book, and that "he traced with her, her line of ancestry, and the descent of that ancestry" as shown by the book. That he now had a copy of that book, obtained from Charles S. Cone, of Wisconsin. That Ada's father was named Albert Cone, and that in 1925 or 1926 he met Ada on the street and that she told him her mother was dead, and that the author of the book, William Whitney Cone, had died about a year before.

The testimony of Mr. Hamill indicates that Ada Cone Stewart had no knowledge of any relatives on her father's side of the family that she knew of, other than as shown by the book—which book it is contended constitutes the declaration of William Whitney Cone, which the plaintiffs below sought to introduce in evidence by showing *aliunde* that the said declarant was related to the said Mrs. Stewart. Our view is that the relationship of the declarant to Ada Cone Stewart was not sufficiently shown by evidence, aliunde the declaration, the book itself, to authorize the introduction of the book in evidence as a mere declaration. However, the chancellor saw fit to admit it, perhaps for other reasons which we will advert to later.

We might say here that it was contended that Hamill's testimony should not have been admitted in view of the provisions of Section 90.05 F.S.A. 1941. A close study of the language of that statute makes its applicability here extremely doubtful. The theory of appellants' bill was that it was not brought against Mrs. Stewart's heirs, but by the true heirs against those who had unlawfully been adjudicated to be her heirs. The bill had been dismissed as against the administrator before this testimony was taken. The objection, based on the said statute, was not well founded.

Generally speaking, the theory underlying the acceptance of the declarations as to pedigree made by deceased persons who were members of or intimately conected with the family is based upon the theory that such persons were familiar with those matters of family history, tradition and repute with

which the members of most families are familiar, although based upon hearsay within the family, and that, having been made before any controversy had arisen, there was no motive to speak other than the truth. As was said by Justice Paxson in the old case of Sitler v. Gehr, supra:

"Indeed we scarcely realize how little we actually know from our own observation and investigation. We learn the truths of history, the secrets of science and our knowledge of the world generally, from what we have read, or from what others have told us. What does a man know of his deceased ancestors but what he has learned from his immediate relatives? How was the plaintiff, who had never seen Belser Behr, of Berks County, to know that the latter was his uncle except from his mother? It is in just such cases that the strict rules of evidence are relaxed as regards hearsay. If it were otherwise pedigree could not be proved at all in many cases, and in one sense it is primary not secondary evidence. The law upon this point is clearly stated in 1 Wharton's Evidence, Sec. 201: 'Pedigree, from the nature of things, is open to proof by hearsay in respect to all family incidents, as to which no living witness can be found. If what has been handed down in families cannot be in this way proved, pedigree could not, in most cases, be proved at all.' "

See also 31 C.J.S. 970 et seq.; 1 Greenleaf on Evidence, 3rd ed., Sec. 114, et seq.; 20 Am. Jur. 409, et seq., and other authorities already cited.

It is also well settled that entries as to births, deaths and marriages shown by family Bibles, Church registers and certificates and inscriptions on monuments; hospital records and hotel registers (under certain circumstances and for certain purposes); letters of deceased relatives containing statements as to family matters, although entitled to different degrees of credibility; recitals in wills, deeds of conveyance, and in marriage settlements and certificates; inscriptions on family portraits, rings, and other family memorials; school censuses and other books and public records which mention births, marriages and deaths, are admissible under certain circumstances. All these, and other matters, are treated in the books.

The book here in question, entitled "Some Account of the Cone Family in America," was written over a period of years by William Whitney Cone and published by him in 1903. This was abundantly proven by his daughter, Mrs. Isabelle C. Harvey, a resident of Topeka, Kansas. The book is more than a mere declaration by a member of a family of matters of family history and repute which would ordinarily be known by any member of any particular family. It is a history and genealogy of the Cone family in America, replete with personal sketches of the careers of many members of that family. It deals primarily with the descendants of Daniel Cone, progenitor in America of the most numerous branch of the Cone family, who settled in Haddam, Connecticut, in 1662, when he appears as one of twenty-eight persons who received from the Connecticut Colony a grant of a considerable body of land situated on both sides of the Connecticut River. The first mention of Daniel Cone, which the author was able to find, was a requisition, signed by Governor John Winthrop, of the Connecticut Colony, to Peter Stuyvesant, Governor of New Netherlands, dated March 2, 1657, and contained in the Massachusetts Historical Collection. The requisition, in the form of a letter, begins: "Honored Sir: Complaint being made to me by Daniel Cone that one James Parker," etc.

In 32 C.J.S., 626, Sec. 717, it is said:

"As a general rule a book or other publication printed by a private person and not shown to be approved by any public authority is not competent evidence of the facts therein stated, at least if it does not appear to be in general use among the class of persons interested in the matters of which it treats, and if on account of the recent occurrence of the facts or for other reasons they may be proved by living witnesses or other better evidence. Books and other printed publications shown to be in general use among the class of persons interested in the matters which they contain have, however, been held admissible."

This is indeed a remarkable book; handsomely published and skillfully arranged. The evidence shows that the author carried on an enormous correspondence and also made a trip East, especially to Connecticut, to check over the records and

to obtain information. He was born in Monroe County, N. Y., December 18, 1836. He moved from New York to Kansas in 1869, where he engaged in newspaper work and was also clerk in the State Historical Society. He moved to Brandsville, Missouri, in 1896 and lived there until his death, in 1924. He was interested in historical matters and wrote a History of Shawnee County, and contributed to historical magazines. This we get from the book itself and from the testimony of his daughter, Mrs. Harvey. The book is a combination of genealogy and history, and consists of 547 pages including the index. Five hundred copies were published and all but about six volumes, which the author and his family retained, were distributed mostly among the numerous members of the Cone family in thirty-one states. Several copies were deposited in public libraries. Former Governor of Florida, Hon. Frederick P. Cone, obtained a copy. These books were sold at $5.00 per volume, which was very small compensation indeed to the author for his many years of painstaking work and investigation. Independently of the book, the relationship of the author to the Cone family, whose history he gives, is established by the testimony of his daughter, his grandson, Randal C. Harvey, and to some extent by George A. Root, co-worker with the author of another genealogy, "The Bishop Family."

There was ample evidence that this book was well received and regarded as authoritative by many members of the Cone family, including Florida's recent Governor, Frederick P. Cone, whose name is included in the book, Serial No. 6522, and his ancestorship shown. It is true that Governor Cone belonged to a different branch of the family from that of these appellants, but his testimony was that from information he had received from his father and uncles he was quite familiar with his family history for several generations back, and said that he had checked the book with his own knowledge of the history of his branch of the Cone family, and found that it was correct with the exception of a few immaterial errors as to dates and initials. Otherwise the book was correct for four generations back, which was as far as his information went. That he had discussed the book with some of his own family

at Statesboro, Georgia, where his great-grandfather lived during the Revolutionary War, and that they stated practically the same facts as those set forth in the book and he considered it an authentic history of the Cone family. He also said that he had met many members of the Cone family from Ohio and practically all of the northeastern states and some of the western states and had discussed the Cone family book with some two dozen of them. He had no interest in this litigation and knew nothing about it until shortly before he was called to testify. The author of the book, who was at that time State Librarian of Missouri, wrote him about it when he was getting it up and later wrote to Governor Cone's brother, who gave the author some information about his immediate family and their ancestors.

The author expresses his appreciation to a long list of persons who have assisted him in assembling available data, and in furnishing family records. He makes no claim to infallibility. But the modesty of his preface tends to increase one's confidence in the author and compiler.

Appellees contend that the book referred to is a mere private writing of William Whitney Cone, and nothing more than a written declaration by him printed in book form. And there being no proof aliunde that the writer was related to Ada Cone Stewart, it was not admissible evidence.

If appellees premises were correct, we could readily agree, but for the reasons above stated we think that the book is more than a mere declaration of the author, and it having been proven by several witnesses who were members of the Cone family that they had found it to be authentic, we have reached the conclusion that the book constituted at least prima facie evidence of the genealogy of the Cone family and that the chancellor below was not in error when he admitted it in evidence. We find no precedent directly in point which sustains our conclusion, but we are convinced of its soundness. The chancellor did not pass directly upon its evidentiary value, however, as he decided the case against these appellants on other grounds. We have examined this book sufficiently to find that it shows prima facie that Ada Cone Stewart was a fifth cousin of the author of the book, both being direct de-

scendants of the progenitor of the main branch of the Cone family in America, Daniel Cone. Appellants contend that this book clearly shows that all the plaintiffs and nine defendants are relations and heirs of Ada C. Stewart, most of them being second cousins.

We have not attempted to verify in *full* this contention from the book itself, but we have done so in part. It will be observed that the allegations appearing in the bill of complaint are to the effect that Ada Cone Stewart left surviving as her only heirs at law certain descendants of the brothers of her grandfather, Asa Cone. Twenty-two of these alleged descendants are named in the bill of complaint, thirteen as parties plaintiff and nine as parties defendant. We have carefully traced the lineage, as shown by said book, of Ada Cone Stewart back to Ashbel Cone, who was born in 1749 and who was the father of Ada Cone Stewart's grandfather and his brothers. We have also traced the descendants of these brothers and have found among them at least three persons whose names are identical with the persons named as plaintiffs in this suit, namely: Charles S. Cone, John Sydney Hunt, and Franklin T. Cone, and at least four persons whose names are identical with the persons joined as parties defendant, namely, Grace Louisa Strayer, William Hawks Cone, Mary Yates Cone, and Mabel B. Fowler.

Counsel for appellees do not take issue with the argument of counsel for appellants that the book does show, prima facie, that these appellants are heirs of Ada Cone Stewart, as we understand their brief, but they do stoutly contend that the book is not and should not be considered as legal evidence in this case. The chancellor evidently did not consider the book sufficient to prove that the author was related to Ada Cone Stewart. As to this point, our examination of the book leads us to a different conclusion. But the chancellor held that regardless of the attempt to establish relationship by book declarations, the plaintiff failed to make any showing of present interest in or right to the estate.

We think that the appearance of these names in the genealogy of the Cone family introduced in evidence is something more than a mere coincidence and is entitled to con-

siderable weight, particularly when it is considered that the book was published in 1903, at a time when the controversy now before the courts could not have been within.the anticipation of the publisher, and that there is also in the record the testimony of members of the Cone family who are not parties to this dispute or will not profit by the outcome, who say that they have examined the book and find it correct in essential particulars. In our view, this testimony, together with what we have found from our own examination of the book itself, lends such great authenticity to the publication as a correct history of the Cone family as to lead us to the conclusion that it must be accepted as establishing, prima facie, the right of at least some of the parties plaintiff to maintain this suit.

The chancellor in his opinion and decree said:

"If the relationship of appellants to Ada Cone Stewart had been established by a preponderance of the evidence, there are other matters which present obstacles to a decree in their favor. Among these is the fact that the bill alleged that plaintiffs had no knowledge concerning the death of Ada Cone Stewart until within 90 days prior to the filing of the instant suit. This allegation was made in an attempt to avoid application of the doctrine of laches. Some of the defendants herein are purchasers of real property which had been owned by Harrison J. Stewart and Ada C. Stewart, his wife, during their lifetime. The evidence discloses that Mr. Hamill, counsel for plaintiffs, learned of Mrs. Stewart's death and made inquiry concerning it through the County Judge of Pinellas County sixteen months prior to the institution of the suit."

On this point, counsel for appellants allege that the thirteen plaintiffs were widely scattered, being residents of eight different states, that then the fourteen heirs of Harrison Stewart had to be located and the amount of the shares received by them determined; that the job of locating Ada's heirs, discussing with them their rights and interests, and allowing time for intercommunication among such heirs for concerted action, all required an immense amount of time and labor; that it was about April 1936 when Mr. Hamill received knowledge of the deaths of Mr. and Mrs. Stewart, and he then began writing letters and making inquiries regarding what

had been done in the administration of the estate, these letters running from April to July 1936 and which are in evidence; that by the end of 1936 five of the plaintiffs and five of the twenty-two heirs of Ada had joined with Charles S. Cone in employing counsel. That the administration of the estates of Mr. and Mrs. Stewart were not fully and completely closed until September 19, 1936. Eleven months later on August 19, 1937, a bill of complaint was filed. That from the time the first information reached Attorney Hamill in March or April 1936 to the time the first bill of complaint was filed, 17 months had intervened. That it required all of this time to ascertain and present to the court the names of each of the heirs and their places of residence and that when the suit was filed, all of the real estate, excepting a house and lot sold to Ellis R. Stetson, was being held by Harrison Morgan Jones for himself and the other heirs, and was being rented out for their benefit. That Stetson purchased from Harrison's heirs in 1936, about a year before the bill was filed, and that the doctrine caveat emptor applied to his purchase. It is also urged that the court below overlooked the fact that knowledge of Mr. Hamill was not the knowledge of the plaintiffs until he had been employed by them, and that at the end of 1936, seven months before the suit was filed, only five of the plaintiffs had employed counsel, and that the record shows that the searches and investigation required to be made continued up to within sixty days of the filing of the suit. Furthermore, laches was not interposed as a defense by any of the defendants.

While the allegation of the bill that *none* of the plaintiffs had any knowledge of the death of either Ada or Harrison until within three months of the filing of the original bill, was disproven by the evidence as to at least several of the plaintiffs, laches was not pleaded, and our view is that the only defendants who were injured by the delay and who might have the right to raise the question of laches are Ellis R. Stetson and his wife who purchased a house and lot from Harrison Stewart's heirs, and paid for it, and received a deed, some time before the first bill was filed, and when the chancery decree above referred to, adjudicating the heirs of Harrison J.

Stewart to be the heirs of Ada Cone Stewart, and the orders of the probate court authorizing the distribution of the personal property of the estate on that basis, were of record, unappealed from and unattacked. While we have held above that said chancery decree was void for lack of jurisdiction in so far as it affected the real estate, and the personalty as well no attack had been made thereon when Stetson purchased the house and lot.

Appellants contend, not only that no laches was shown by the evidence, but that laches was not pleaded as a defense, and the question cannot now be raised. On this last point, we must differ. In Geter v. Simmons, 57 Fla. 423, 49 So. 131, we held that:

"The recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though laches are not pleaded or the bill demurred to."

It was also said in that case:

"The question of laches turns not simply upon the number of years which have elapsed before the accruing of rights and the assertion of them, but also upon the nature and evidence of those rights, the changes in value, and other circumstances occurring during the lapse of years."

We have also held that, to render the defense of laches effective, the delay must be such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible, or such a change in conditions must have occurred which would render it inequitable to enforce the rights asserted. Ft. Pierce Bank & Trust Company v. Sewall, 113 Fla. 811, 152 So. 617. It that case it was held that there was nothing to show that the appellant was prejudiced by the delay to the extent that it might equitably charge appellee with laches.

And in the case of Geter v. Simmons, supra, this court quoted with approval from a decision by the Supreme Court of the United States as follows:

"The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice . . . it will not exert its equitable power in order to save one from the consequence of his own neglect."

In 19 Am. Jur. 340, it is said that:

"Laches is negligence or omission seasonably to assert a right." Citing a case from Maine which is reported in Ann. Cas. 1913 B, 366.

The question as to whether relief shall be granted is to be determined in view of the showing as to whether the situation of the adverse party underwent a change during the period which elapsed while the complainant delayed institution of suit. 19 Am. Jur. 346, citing Pratt Land & Improvement Co. v. McClain, 132 Ala. 452, 33 So. 185. But plaintiff's delay in the institution of suit will not preclude the granting of relief where plaintiff's omission sooner to assert his claim is satisfactorily explained. 19 Am. Jur. 347.

The question is not free from difficulty, but in the light of the above authorities our view is that on this record the only appellees who were prejudiced by the delay of appellants in bringing suit were Ellison R. Stetson and wife, who bought and paid for the house and lot hereinabove alluded to, receiving a deed thereto from those persons whom the chancery court had held to be the heirs of Ada Cone Stewart. But if these appellants are able to show the court below by their evidence, and by the use of the book, "The Cone Family in America," as prima facie evidence of the family history therein set forth, that they are the true heirs of the said Mrs. Stewart, the heirs of Harrison J. Stewart, who received the purchase price of the said lot from Stetson, should be required to turn over the proceeds thereof to these appellants. It would likewise follow of course, that if the above conclusion is reached by the chancellor below by the use of such evidence, that these appellants should be declared the owners of all the

other real estate which Ada Cone Stewart owned at the time of her death.

We come now to the claim of appellee that the lower court was correct in holding that these appellants should be denied all relief on the ground of champerty. In this connection we think it but fair to quote what the able chancellor below had to say on this subject:

"It also appears from the evidence that said Hamill entered into a champertous contract with the plaintiffs. It is true that the champertous contract is not sought to be enforced herein. Nevertheless, this champertous contract is a matter appropriate to be considered, particularly in view of the fact that not *one of these plaintiffs* ever presented himself or herself before this court to give his or her testimony in person or by deposition. If the nominal and nonappearing plaintiffs should prevail, the fruits of this unethical and illegal contract of maintenance and champerty in all probability would be harvested by the perpetrators thereof. Whatever interest has been exhibited in the prosecution of this chancery suit has been exhibited almost exclusively by Mr. Hamill, and his law partner, Mr. Schatz, who are attorneys at law and who entered into the champertous contract. It would be unconscionable for a court of equity to encourage illegal contracts of this character. A decree favorable to plaintiffs would have such effect.

"The court deems it appropriate to observe that this contract was apparently made before the Honorable James H. Finch's entry into this suit. He has worked unstintingly in behalf of his clients and presented his contentions in a forceful, courteous and able manner.

"It is reasonable to assume that this litigation was the result of what some lawyers call 'bird-dogging' and in other fields of the law has been termed 'ambulance chasing.' While in some instances meritorious causes have been unearthed by such tactics, the use of them is not to be commended and certainly nothing should be indulged nor presumed which would be favorable to the real parties in interest under such circumstances. On the contrary, the proof of the right of the plaintiffs to prevail and thereby primarily benefit attorneys at

law who have been guilty of champerty, should be clear, definite, positive and leave no doubt as to their right to equitable favor. Particularly is this true when one of the contracting attorneys refused to testify as to the percentage or amount which the attorneys were to receive under said contract, basing his refusal upon the theory of 'a privileged communication.' "

We might observe that the exact terms of the contract of employment made by appellants with their original attorneys, and whether such contracts were written or oral, were not proven in this case. Attorney Hamill testified in effect that he and his associate, Mr. Schatz, were employed on a contingent fee basis, based on a percentage of the amount or value of the property recovered. He was not asked what that percentage was, but that question was put to Mr. Schatz, and he declined to answer it on the ground that this was a privileged matter between attorney and client. Mr. Hammill also testified that none of his clients had paid him any money to cover any expenses that had accrued or might accrue in connection with the prosecution of the cause. It was also shown that one of his associates had paid taxes on one of the lots which the appellees had allowed to become delinquent. It is strange, too, that none of the plaintiffs appeared in court or testified in the case, but we gather from the record that the plaintiffs were scattered and lived in various states, a considerable distance from the place of trial. However, their testimony, if of value, could have been obtained by deposition.

Champerty was not pleaded as a defense in this case, but, like laches, if it clearly appears from the record, a court of equity might take appropriate action. Our view is that it is not plainly made to appear by this record. The authorities are in conflict on the question as to whether champerty must be specifically pleaded, but it appears that the question is one which cannot be raised after judgment. See 14 C. J. S., 386, Sec. 44. In one of the briefs filed in behalf of appellants in this case, it is said that "None of the plaintiffs has made any assignment of his or her interest in said estate or of the right of action therefor." This may be true, but there is no evidence in this record for or against this statement.

In 11 C. J., at page 270, it is said:

"Except in one state, the rule is well settled that the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of defendant to plaintiff. It is the champertous contract and not the right of action itself which the contract avoids, and therefore defendant cannot avail himself of the champertous agreement as a defense to the action. Conversely the laws against champerty and maintenance cannot be used as offensive weapons against defendant."

To like effect, see 14 C. J. S. page 382, Section 38.

In this case, under the cited authority, the plaintiffs in the court below were seeking to enforce an alleged right of inheritance granted by law, and this right should not be prejudiced or denied even though they had made a contract of employment with their attorneys which might be held champertous and unenforcible as between them and such attorneys. It is the right to inherit, and not the alleged champertous agreement, which plaintiffs below were seeking to enforce. There is no effort being made in this cause to enforce a champertous contract. How, then, can plaintiff's cause of action be affected thereby, even if there was such a contract? See Calhoun County v. Cooner, 152 Miss. 100, 118 So. 706; Ellis v. Smith, 112 Ga. 480, 37 S. E. 739; 10 Am Pur. 572, Sec. 29; and 14 C. J. S., 382, and cases cited.

Proper contracts for contingent fees for an attorney are recognized and upheld by the court generally. U. S. v. Call, 287 Fed. 520; 5 Am. Jur. 359, et seq.; 7 C. J. S. 1063; Johnston v. Cox, 114 Fla. 243, 154 So. 206; Tenney v. City of Miami Beach, 152 Fla. 126, 11 So. (2nd) 188.

The general rule seems to be that a suit will be dismissed because of champerty only when the champertous assignment or other champertous contract is the basis of plaintiff's claim and is directly involved in the action, and not when the champertous contract is one between the plaintiff and his attorney, collateral in its nature, and which in no wise affects the obligation of the defendant to the plaintiff. It is the champertous contract which is void, and the right of action of

the plaintiff is not affected thereby, but must stand or fall upon its own merits or demerits. See 14 C. J. S. 382, and cases cited.

The decree is reversed and the cause remanded, with directions to enter a decree for appellants and such of appellees as are found to be heirs of Ada Cone Stewart. If the chancellor becomes convinced that it is necessary to take further testimony on the issue of this relationship, then nothing in this opinion shall be construed as restricting his power to do that.

Reversed and remanded.

CHAPMAN, C. J., THOMAS and SEBRING, JJ., concur.