752 So.2d 42 (2000)
FRIENDS OF NASSAU COUNTY, INC., Sherry Bevis, Charles E. Commander, and David A, Theriaque, Appellants,
v.
NASSAU COUNTY, Florida, St. Johns River Water Management District, and Fisher Development Company, Appellees.
No. 1D97-4285.
District Court of Appeal of Florida, First District.
February 2, 2000.
Rehearing Denied March 7, 2000.
*43 Paul H. Amundsen and Rodolfo Nunez of Amundsen & Moore, Tallahassee, and David A. Theriaque, Esquire, of David A. Theriaque, P.A., Tallahassee, for Appellants.
Marcia Parker Tjoflat and Emily G. Pierce of Rogers, Towers, Bailey, Jones, & Gay, P.A., Jacksonville, for Appellee Fisher Development Company.
BENTON, J.
Friends of Nassau County, Inc., (Friends) and Sherry Bevis, Friends' president and sole director, along with Charles Commander and David Theriaque, lawyers who represented Friends, appeal a final order imposing sanctions under section 120.57(1)(b)5., Florida Statutes (1995) (now codified at section 120.569(2)(c), Florida Statutes (1999)). Nassau County and Fisher Development Company (Fisher), the permit applicants who sought sanctions, did not show that petitions Friends filed in opposition to environmental permits they sought from St. Johns River Water Management District (SJRWMD) were "objectively unreasonable." We therefore reverse the order imposing sanctions. We do find Friends and Ms. Bevis sanctionable, however, because she did not read the petitions before signing them on behalf of Friends. Accordingly, we remand for reconsideration of appropriate sanctions as to them.

I.
We have jurisdiction. An administrative law judge's order imposing sanctions *44 under section 120.57(1)(b)5., Florida Statutes (1995), is a final order subject to judicial review.[1]See Department of Health and Rehabilitative Servs. v. S.G., 613 So.2d 1380, 1384-85 (Fla. 1st DCA 1993). As was pointed out in Procacci Commercial Realty, Inc. v. Department of Health and Rehabilitative Services, 690 So.2d 603, 605 n. 5 (Fla. 1st DCA 1997), the agency, itself a litigant subject to sanctions under section 120.57(1)(b)5., Florida Statutes (1995), has no authority to review such an order.

II.
In March and April of 1996, after deciding to build the Amelia Outlet Mall in Nassau County on a site that included wetlands, Fisher filed applications with SJRWMD for permits to dredge and fill and to construct a stormwater management system. Contemporaneously, Nassau County filed an application with SJRWMD for an environmental resources permit as part of a related plan to realign a road and construct a stormwater management system to handle drainage from the new mall parking lots and other anticipated development.

III.
On June 7, 1996, Mr. Theriaque made a written request to SJRWMD that it keep him informed regarding the status of these permit applications.[2] In late June or early July, his firm sent SJRWMD two public record requests pertaining to Fisher's and Nassau County's application files. Christine Wentzel, a SJRWMD employee, telephoned Rebecca O'Hara, a lawyer in Mr. Theriaque's office, and informed her that the permit files would be available for inspection at "the front desk." Ms. Wentzel was not present when Ms. O'Hara reviewed the files, but Ms. O'Hara did come by, examine the permit files, and copy documents. The record does not reveal whether Ms. O'Hara's visit to SJRWMD's *45 offices took place before, on, or after July 1, 1996.
In the file at the time Ms. O'Hara reviewed it were copies of SJRWMD's third and final written request addressed to Sims Design Consultants, Inc. (Sims) for additional information as to permit application # X-XXX-XXXXAG-ERP,[3] dated June 17, 1996, and the response Sims, the engineer of record for both Fisher and Nassau *46 County, filed on June 24, 1996. No party contended otherwise. Neither this detailed request nor the response, which was at least equally detailed, made any mention of a clay liner for the stormwater management pond, or gave any indication that a clay liner was under consideration.
On July 17, 1996, SJRWMD notified interested parties, including Mr. Theriaque, that SJRWMD intended to approve Fisher's and Nassau County's permit applications on August 13, 1996. The notice set August 5, 1996, as the deadline for filing petitions in opposition for formal administrative proceedings. Mr. Theriaque contacted John Gerard Cordy, a senior environmental scientist with Dial, Cordy and Associates, whom Charles Commander had spoken to six to eight months earlier about the site proposed for the Amelia Outlet Mall.
Thereafter, Ms. O'Hara delivered the documents she had copied from SJRWMD's files to Mr. Cordy by Federal Express. After perusing these documents, Mr. Cordy concluded the design of the stormwater management system might be problematic and recommended that Mr. Theriaque arrange for an engineer to review the design. With Mr. Theriaque's approval, Mr. Cordy retained an engineer, Robert Alderman, to perform the review. On August 2, 1996, Mr. Alderman discussed his findings with Mr. Cordy, who relayed the findings to Mr. Theriaque.[4]

IV.
Mr. Theriaque prepared three verified petitions for Friends contesting issuance of the permits, based in large part on Mr. Alderman's conclusions. The petitions, which alleged, among other things that the stormwater management system would have a deleterious effect on water quality in the surrounding wetlands, left a blank for the signature of an unnamed representative of Friends. Many, but by no means all, of the allegations in the petitions related to the elevation of the stormwater management pond.[5] *47 *48
*49 On August 5, 1996, Mr. Commander contacted Sherry Bevis, a bookkeeper employed by the law firm of Pajcic and Pajcic. The parties stipulated that Pajcic and Pajcic's pension plan had a financial interest in First Coast Center. At Mr. Commander's request, Ms. Bevis signed the necessary incorporation papers to create "Friends of Nassau County, Inc." She thereby became the president, sole director, and sole member of Friends. On the same day, also at Mr. Commander's request, she signed the verified petitions Mr. Theriaque had prepared, but did so without reading them beforehand.[6] As co-counsel for Friends, both Mr. Theriaque and Mr. Commander signed the petitions, as well.[7]
At all pertinent times, Foley and Lardner, Mr. Commander's law firm, represented First Coast Center, which planned to build a similar mall some ten miles from the site of the Amelia Outlet Mall. The proposed malls' proximity and similarity in concept made them competitors for the same tenants. The administrative law judge found that First Coast Center gained a competitive advantage over Fisher because of the delay Friends' challenge to the environmental permits occasioned.

V.
On August 5, 1996, Friends filed the petitions with SJRWMD, which referred them to the Division of Administrative Hearings for further proceedings. The administrative law judge to whom they were assigned consolidated the cases on October 1, 1996. After Ms. Bevis testified at a discovery deposition, Fisher and Nassau County moved to dismiss the petitions and sought sanctions against Friends, Ms. Bevis, and Foley and Lardner, Mr. Commander's law firm.
On October 4, 1996, Friends filed a notice of voluntary dismissal as to all three petitions. The notice indicated that Friends had learned that
the St. Johns River Water Management District will require Nassau County to install a clay liner in its stormwater *50 management pond.[[8]] This action will alleviate the potential adverse impact to the water quality of adjacent wetlands caused by the difference in elevation between the stormwater pond and the adjacent wetland that was identified by the Friends' engineer and referenced in the Friends' Petition for Formal Administrative Hearing.
... Also, the Friends alleged that the calculations provided by Nassau County relating to the stormwater pond's outfall boundary node were incorrect and did not demonstrate that the stormwater pond would discharge properly. Subsequent to the filing of the Friends' Petitions, however, Nassau County's engineer remodeled its original calculations to demonstrate that the stormwater management pond will discharge properly.
Following the voluntary dismissal, Fisher and Nassau County renewed their motions for sanctions. After a hearing, the administrative law judge entered an order recommending an award of fees.[9]

VI.
Any person who signs a pleading or other document for filing in proceedings under the Administrative Procedure Act certifies
that he or she has read the pleading, motion, or other paper and that, to the best of his or her knowledge, information, and belief formed after reasonable inquiry, it is not interposed for any improper purposes, such as to harass or to cause unnecessary delay or for frivolous purpose or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed in violation of these requirements, the hearing officer, upon motion or the officer's own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
§ 120.57(1)(b)5., Fla. Stat. (1995). Florida courts have looked to case law construing Federal Rule of Civil Procedure Rule 11 in interpreting the statutory language. See Mercedes Lighting and Elec. Supply, Inc. v. State, Dep't of Gen. Servs., 560 So.2d 272, 276 (Fla. 1st DCA 1990).
Section 120.57(1)(b)5., Florida Statutes (1995), forbids signing and "interposing" any paper for an "improper purpose."[10]See Mercedes, 560 So.2d at 277. We have never held that opposing issuance of a permitor seeking a permitis improper simply because economic considerations contribute to a party's decision to act. Rather, we have held that
courts should not delve into an attorney's or party's subjective intent or into a good faith-bad faith analysis. Instead, if a reasonably clear legal justification can be shown for the filing of the paper in question, improper purpose cannot be found and sanctions are inappropriate.
Id. at 278. In the same vein, we stated in Procacci Commercial Realty, Inc. v. Department of Health and Rehabilitative *51 Services, 690 So.2d 603 (Fla. 1st DCA 1997):
The use of an objective standard creates a requirement to make reasonable inquiry regarding pertinent facts and applicable law. In the absence of "direct evidence of the party's and counsel's state of mind, we must examine the circumstantial evidence at hand and ask, objectively, whether an ordinary person standing in the party's or counsel's shoes would have prosecuted the claim."
Id. at 608 n. 9 (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1515 (11th Cir.1991)). See In re Sargent, 136 F.3d 349, 352 (4th Cir. 1998) ("Put differently a legal position violates Rule 11 if it `has "absolutely no chance of success under the existing precedent."') Brubaker v. City of Richmond, 943 F.2d 1363, 1373 (4th Cir.1991)(quoting Cleveland Demolition Co. v. Azcon Scrap Corp., 827 F.2d 984, 988 (4th Cir.1987))."
A homeowner may initiate administrative proceedings in appropriate circumstances even though she is concerned about the value of her house as well as the aesthetics of the neighborhood. Whether an economic interest confers standing is a separate question. See, e.g., Agrico Chemical Co. v. Department of Envt'l Regulation, 406 So.2d 478 (Fla. 2d DCA 1981). Whether section 120.57(1)(b)5., Florida Statutes (1995), authorizes sanctions for an initial petition in an environmental case turns, not on the question whether an unadulterated love of the out-of-doors motivated the signing of the petition, but on the question whether the signer could reasonably have concluded that a justiciable controversy existed under pertinent statutes and regulations. If, after reasonable inquiry, a person who reads, then signs, a pleading had "reasonably clear legal justification" to proceed, sanctions are inappropriate. Procacci, 690 So.2d at 608 n. 9; Mercedes, 560 So.2d at 278.

VII.
The principal theory Fisher and Nassau County advanced in the proceedings below was that sanctions were justified on a subjective bad faith theory of the kind our decision in Mercedes ruled out. But, as the proponents of sanctions, Fisher and Nassau County had the burden to show that those signing the petitions lacked legal justification for doing so. Except as to Ms. Bevis, they did not carry their burden. The sum and substance of their showing in this regard was that the applicants' engineer had agreed to line the stormwater management pond with clay by the time SJRWMD issued its notice of intent to issue the permits.[11] This fell far *52 short of demonstrating that any one of the petitions was devoid of merit.
Friends' petitions alleged many grounds that did not depend on the absence of a clay liner. As to those grounds as well as the grounds that assumed no clay liner, moreover, counsel were entitled to rely and did rely, as far as the record reveals, on the opinions of experts whose credentials and expertise have not been called into question. When making inquiry, lawyers and parties alike may rely on the opinions of experts, when it is reasonable to do so.[12]Cf. Ball v. City of Chicago, No. 90 C 2331, 1992 WL 212628, at *11 n. 3 (N.D. Ill. Aug. 28, 1992) ("The Court concludes that Professor Kirkham's opinion evidences a `reasonable inquiry' on counsel's part into the underlying factual and legal bases for the amended count III. Accordingly, the Court will decline to impose sanctions at this time."), affirmed, 2 F.3d 752 (7th Cir.1993); Wagner v. Allied Chemical Corp., 623 F.Supp. 1407, 1411-12 (D.Md.1985) ("It appears that plaintiffs' attorney did conduct an inquiry which falls within the range of reasonableness prior to filing this action. Although defendants point out serious factual weaknesses with several of the claims, plaintiffs' attorney did consult with an expert, talked to claimants, and received an oral opinion from a doctor who examined most of the claimants, prior to filing this action. This inquiry is sufficient to avert sanctions under Rule 11."). "An attorney may not be sanctioned for a complaint that is not well-founded, so long as she conducted a reasonable inquiry." Keegan Management Co., Securities Litigation v. Keegan Management Company, 78 F.3d 431, 434 (9th Cir.1996).
The administrative law judge misplaced the burden on the objectors to show that fees should not be awarded under section 120.57(1)(b)5., Florida Statutes (1995). An award was warranted, the judge ruled, because

no reasonably clear legal justification has been shown for the filing of the three petitions which initiated these proceedings. Petitioner's lone representative had no knowledge of the basis for the petitions and indeed signed the petitions knowing at least one of the statements in the petitions was false. In so signing, she relied entirely on her attorneys. It is unknown who the attorneys truly represent. However, it is known that one of the attorney's clients, First Coast Center, gained a competitive advantage by delaying the issuance of the permits for the Amelia Island Outlet Mall and the road improvements.... Moreover, the evidence did not demonstrate reasonable inquiry by the attorneys or facts which would justify a reasonable legal or factual basis for these proceedings.

(Emphasis supplied.) On this basis, the administrative law judge ordered Friends and Ms. Bevis, as well as Mr. Commander and Mr. Theriaque, to pay Fisher's and Nassau County's attorneys' fees.

VIII.
We share the administrative law judge's apparent concern about the possibility *53 of champerty and maintenance[13] and agree with the judge's implicit conclusion that the circumstances raise substantial questions of business ethics.[14] But we respectfully disagree that the petitions Friends filed were proven to be objectively unreasonable. This lack of proof precludes imposing sanctions on Mr. Commander and Mr. Theriaque.[15]

IX.
We find no reason, however, to disturb the administrative law judge's finding that Ms. Bevis did not read the petitions before signing them. This failure makes her vulnerable to appropriate sanctions under section 120.57(1)(b)5., Florida Statutes (1995).
[W]hen a public official or corporate officer violates Rule 11 in the course of *54 performing agentival duties, it is permissible and frequently wisefrom the standpoint of deterrence to direct that the offender pay a monetary sanction personally.
Navarro-Ayala v. Nunez, 968 F.2d 1421, 1427 (1st Cir.1992). See also Project 74 Allentown, Inc. v. Frost, 143 F.R.D. 77, 83 n. 7 (E.D.Pa.1992). The statute imposes nondelegable duties on each signatory.
Because Ms. Bevis acted in a corporate capacity, Friends is also liable for appropriate sanctions on account of her failure to read the petitions before signing them. Sanctions may be imposed on a corporation where a natural person signing on behalf of the corporation fails to make adequate inquiry, see Business Guides, Inc. v. Chromatic Communications Enters., Inc., 498 U.S. 533, 546, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991), or, as here, does not read the pleading before signing.
We reverse imposition of sanctions on Mr. Commander and Mr. Theriaque. We also reverse the specific sanctions imposed on Ms. Bevis and Friends and remand for reconsideration of what sanctions are appropriate for Ms. Bevis and Friends in light of our conclusion that the petitions they filed were not proven to be objectively unreasonable.
Reversed and remanded.
BOOTH, J. CONCURS; PADOVANO, J., DISSENTS WITH OPINION.
PADOVANO, J., dissenting.
I respectfully dissent. In my view, the majority has improperly substituted its judgment for that of the administrative law judge on a matter of discretion.
It is clear from the record that the appellants created a corporation known as Friends of Nassau County for the sole purpose of initiating an administrative action which they knew to be unsupportable at the time of filing. Friends of Nassau County is not a public interest group as the name suggests, but rather it is a corporation comprised of individuals who are business competitors of the Fisher Development Company. The action in question was not brought to assert any legitimate environmental concern, but rather to delay the permitting process long enough to defeat Fisher's opportunity for development. The appellants succeeded in this objective and then they voluntarily dismissed the action.
The import of Friends' conduct in this case appears to have been lost in the majority's lengthy and complex recitation of the facts. Yet what transpired here was very simple: one party misused its right of access to the administrative process for the sole purpose of gaining an advantage over another. This improper motive is plainly revealed by the history of the case.
In the early part of 1996, Fisher Development Company was planning to build a mall to be known as the Amelia Outlet Mall in Nassau County. At approximately the same time, another business concern known as First Coast Center was planning to build a shopping mall about ten miles away. The two malls would compete with each other for commercial tenants.
In March 1996, Fisher Development Company applied for two environmental permits from the St. Johns River Water Management District. One of the permits would allow the placement of fill dirt at the site of the proposed mall, and the other would authorize the construction of a surface water management system. In conjunction with these applications, Nassau County applied to the District for a permit to construct a master surface water management system to serve the drainage basin for a larger area including the proposed outlet mall.
While these permit applications were under consideration, attorney David Theriaque was monitoring the District's file on behalf of an undisclosed client. On June 7, 1996, Theriaque wrote the District and asked that he be kept informed of the status of the permit applications by Fisher and the County. Several weeks later, *55 Theriaque sent his associate, Rebecca O'Hara, to the District office to obtain information pertaining to the permit applications. Ms. O'Hara inspected the files containing the applications and made copies of materials in the files.
The District gave notice on July 17, 1996, of its intent to grant Nassau County's application and both of the applications submitted by Fisher Development Company. According to the notice, any affected party could contest the permit applications by filing a petition with the District not later than August 5, 1996.
On July 31, 1996, attorney Theriaque retained John Cordy, an environmental consultant, to review the materials O'Hara had obtained from the District's office. This was not Cordy's first evaluation of the proposed construction at the site of the Amelia Outlet Mall. He had been retained at some point between December 1995 and February 1996 by attorney Charles Commander, the attorney for First Coast Center, to determine whether there were any environmental problems that might make the outlet mall site unsuitable for a mall. When Cordy was retained for the second time, he hired Robert Alderman, a civil engineer, to study the materials from the District's file. Cordy presented his findings to Theriaque on August 2, 1996, several days before the deadline for contesting the applications.
Attorney Theriaque then drafted three petitions challenging the permit applications and requesting a formal administrative hearing. He prepared these petitions on August 5, 1996, on behalf of a corporation named Friends of Nassau County, which was not yet in existence. On the afternoon of August 5, 1996, attorney Charles Commander called Sherry Bevis, a bookkeeper in the law firm of Pajcic and Pajcic, and asked her to come to his office. Ms. Bevis was to become the president and sole director of Friends of Nassau County, Inc. She went to Commander's office as requested and signed the necessary incorporation papers. On behalf of the corporation, Ms. Bevis then signed the petitions Theriaque had prepared to challenge the issuance of the environmental permits. The petitions were timely filed later in the day.
The case was transferred to the Division of Administrative Hearings, and Fisher intervened. Then the progress of the case was delayed in discovery. The parties could not agree on acceptable dates for depositions and, when the depositions were eventually set, attorney Theriaque moved for a protective order challenging the location of the depositions and Friends' duty to produce the documents requested by Fisher's subpoena. During the depositions, Rebecca O'Hara objected to numerous questions concerning the ownership of Friends of Nassau County, Inc. and the nature of its interest in the Amelia Outlet Mall project. The administrative law judge later ordered Friends to answer Fisher's questions but, given the events that followed, the depositions were never rescheduled.
On September 27, 1996, attorney Theriaque requested a stay of the administrative proceeding so that the parties could explore a settlement. Several days later, Fisher and the County moved to dismiss the petitions on the ground that Friends of Nassau County was a sham corporation organized to prosecute the petitions for an improper purpose. Fisher and the County also sought the imposition of sanctions against Friends, Bevis, and Commander under section 120.57(1)(b)5, Florida Statutes. These motions were consolidated with the original petitions and scheduled for hearing, but before the hearing, Friends voluntarily dismissed the petitions in all three cases.
The administrative law judge held an evidentiary hearing on April 29, 1997, to resolve the issue of sanctions. Based on the testimony and evidence presented, the judge determined that Friends had filed the petitions for an improper purpose. Specifically, she found that the environmental *56 concerns Cordy had identified and presented to Theriaque had all been addressed and resolved before the filing of the petitions, and that the information relating to the resolution of those concerns was contained in the District's file when it was examined by Theriaque's associate. No changes were made in any of the permit applications as a result of the issues raised in Friends' petition.
Fisher expected to have the permits by the time of an industry convention in October 1996 so that it could begin to recruit commercial tenants for the mall. The permits were eventually issued, but, as the administrative law judge found, Fisher suffered substantial damages as a result of the delay. On a related point, the judge also found that representatives of First Coast continued to tell Fisher's prospective tenants that the Amelia Outlet Mall would be delayed by the absence of environmental permits even after the permits had been issued.
Finally, the administrative law judge determined that Friends of Nassau County, Inc. was a sham corporation formed for the sole purpose of challenging the environmental permits. The judge found that the president and sole director, Sherry Bevis, did not know of any corporate meetings, that she had no knowledge or control of the corporation's finances, and that she had not read the petitions Theriaque had prepared on behalf of the corporation. The record shows only that Bevis was employed by the Pajcic and Pajcic law firm and that the firm's pension plan has an ownership interest in Fisher's competitor, First Coast Center.
On October 19, 1998, the administrative law judge entered a final order assessing attorneys' fees and costs, pursuant to section 120.57(1)(b)5, against Friends of Nassau County, Inc., David A. Theriaque, Charles E. Commander, and Sherry Bevis.[16] The judge awarded Fisher $50,931.93 plus costs associated with the evidentiary hearing and filing post-hearing pleadings and she awarded the County $2,994 plus costs of the hearing.
Section 120.57(1)(b)5, Florida Statutes (1995), is designed to prevent misuse of the administrative process. The statute creates potential liability for costs and attorneys' fees, which may deter a party who would otherwise initiate a claim or defense for the purpose of delay, to gain an economic advantage, or simply to harass the opposing party. These objectives are clear from the text of the statute:
All pleadings, motions, or other papers filed in the proceeding must be signed by a party, the party's attorney, or the party's qualified representative. The signature of a party, a party's attorney, or a party's qualified representative constitutes a certificate that he or she has read the pleading, motion, or other paper and that, to the best of his or her knowledge, information, and belief formed after reasonable inquiry, it is not interposed for any improper purposes, such as to harass or to cause unnecessary delay or for frivolous purpose or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed in violation of these requirements, the hearing officer, upon motion or the officer's own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
§ 120.57(1)(b)5, Fla. Stat. (1995). This statute was incorporated in the present *57 version of the Administrative Procedure Act, with only minor revisions including a change in the designation "hearing officer" to "presiding officer." See § 120.569(2)(c), Fla. Stat. (1997).
Section 120.57(1)(b)5, was patterned after rule 11 of the Federal Rules of Civil Procedure. Our statute, however, applies to a more restricted class of cases. We observed in Mercedes Lighting and Electrical Supply, Inc. v. Department of General Services, 560 So.2d 272, 277 (Fla. 1st DCA 1990), that the "requirement[s] of rule 11[are] directed at three substantive prongs: the factual basis of the paper, the legal basis of the paper, and its legitimate purpose." In contrast, section 120.57(1)(b)5 was enacted to punish only the filing of a pleading or paper for an improper purpose. Nevertheless, the similarity between the statute and the rule has prompted us to rely on the federal cases interpreting the rule as persuasive authority. See Mercedes; Procacci; see generally, Department of Prof'l Regulation, Div. of Real Estate v. Toledo Realty, Inc., 549 So.2d 715 (Fla. 1st DCA 1989) (holding that a state statute modeled after a federal statute "will take the same construction in the Florida courts as its prototype has been given in the federal courts, insofar as such construction is harmonious with the spirit and policy of Florida legislation on the subject").
Applying principles of federal law, we held in Mercedes that the standard for resolving a motion for sanctions under section 120.57(1)(b)5 is an objective standard. The reasonableness of a lawyer's actions in filing an administrative petition should not be determined by the outcome of the proceeding or by the judge's perception of the lawyer's subjective intent. Instead, the determination must be based on an objective evaluation of the circumstances existing at the time the petition was filed. The administrative law judge must decide whether "a reasonably clear legal justification [has been shown] for the filing of the paper in question." Mercedes, 560 So.2d at 278. Among other factors, the judge may consider the time available for investigation and whether the petition is based on a plausible view of the law.
A ruling on a motion to impose sanctions under section 120.57(1)(b)5 is reviewed on appeal by the abuse of discretion standard. See Mercedes.[17] Under Florida law, a reviewing court may find an abuse of discretion only if no reasonable person would have taken the view adopted by the trial court. As the supreme court explained in Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) "If reasonable [persons] could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."
If the abuse of discretion standard had been applied properly, the majority would have been constrained to affirm. Surely the majority could not justify a conclusion that no reasonable person in the position of the administrative law judge would have made the same decision. See Canakaris. The very controversy about the matter in this court proves that theory to be wrong. I believe that the administrative law judge's decision to impose sanctions was entirely reasonable. Furthermore, I believe that many other judges would have done exactly the same thing. The potential imposition of sanctions under section 120.57(1)(b)5 was designed to deter those who would otherwise misuse the administrative process, but the law will have no *58 effectiveness at all if judges are unwilling to carry it out.
It is true that attorney Theriaque engaged the services of an environmental specialist who in turn hired an engineer to review the outlet mall's permit file. However, the environmental problems identified by these experts had been resolved before the petitions were filed. The administrative law judge found that "a map showing the improvements the petitioners desired was in the [District's] file." Although counsel for Friends may not have examined the map, the administrative law judge accepted the testimony of a District employee who said that the map was in the file before it was examined by Theriaque's associate.
A party who objects to proposed administrative action must make a reasonable investigation to ensure that the objection is supported by the facts. The failure to investigate can be used as evidence to support a claim under section 120.57(1)(b)5 that the objection was made for an improper purpose. In the context of a rule 11 proceeding, the Eleventh Circuit has explained "If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound." See Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996). Here, the appellants are not absolved by their subjective belief in the merits of their petitions. Had they examined materials readily available to them in the District's file, they would have known that the petitions were without merit.
The appellants argue that the improvements they sought by filing the petitions were not all incorporated in the final plan, but that argument is refuted by their own notice of voluntary dismissal. According to the notice, the appellants learned that the District was going to require Fisher to install a clay liner in the stormwater management pond and that Nassau County had remodeled calculations on the pond and demonstrated that the pond would discharge properly. The notice then states that the petitions were dismissed because the appellees "have addressed or intend to address the most glaring deficiencies relating to the permits for the outlet mall and its associated master stormwater management system" and because Friends has "accomplished its overall intent in filing its Petitions."
The notice of voluntary dismissal purports to explain why the petitions were filed and why they were no longer necessary, but the problem with the explanation is that all of the justifications for dismissal existed before the petitions were filed. In short, the notice presents all the reasons why the petitions were unnecessary and should not have been filed in the first instance. In any event, the appellants are estopped by the representations in their notice. They cannot be heard to complain that the final plan did not address all of their objections, when the petitions were dismissed precisely for the reason that the objections had been addressed and resolved.
The administrative law judge also concluded that Friends of Nassau County was a sham corporation formed merely as a vehicle for challenging the permit applications. I do not question Friends' status as a lawful entity. Nevertheless, the circumstances of the incorporation in this case provide further evidence that the petitions were filed for an improper purpose. Sherry Bevis, the president and sole director of Friends, knew nothing of the corporate affairs. Bevis was the bookkeeper for a law firm that owned a financial interest in Fisher's competitor, First Coast Center. Moreover, the papers necessary to incorporate Friends were drafted by Charles Commander, who is also the attorney for First Coast. Fisher had many questions regarding the nature of Friends' interest in the applications, but these questions remain unanswered, because the petitions were voluntarily dismissed before the depositions could be rescheduled.
*59 An administrative law judge may consider the circumstantial evidence in addition to the direct evidence in resolving a motion for sanctions. See Procacci. Here, the circumstances give rise to a reasonable inference that the petitions were not filed to advance a legitimate environmental concern, but rather to protect the interests of a competitor. In any event, the administrative law judge was entitled to consider these circumstances. Based on the direct and circumstantial evidence in the record, I cannot say that the sanctions order was an abuse of discretion.
For these reasons, I conclude that the administrative law judge did not abuse her discretion by imposing sanctions under section 120.57(1)(b)5. I would affirm.
NOTES
[1] Originally, SJRWMD properly declined to review the administrative law judge's recommended award of fees under section 120.57(1)(b)5., Florida Statutes (1995), citing Procacci Commercial Realty, Inc. v. Department of Health and Rehabilitative Services, 690 So.2d 603 (Fla. 1st DCA 1997), and Mercedes Lighting and Electrical Supply, Inc. v. State, Department of General Services, 560 So.2d 272, 276 (Fla. 1st DCA 1990). See also Department of Health & Rehabilitative Servs. v. S.G., 613 So.2d 1380, 1384 (Fla. 1st DCA 1993) ("It is also clear that it is the hearing officer under section 120.57(1)(b)5. who has the authority to administer the sanctions prescribed by this section."); Good Samaritan Hosp. v. Department of Health and Rehabilitative Servs., 582 So.2d 722 (Fla. 4th DCA 1991) (hearing officer entered final order pursuant to paragraph 120.57(1)(b)5. which was reviewable by appellate court); Visconti v. North Peninsular Utils. Corp. and Department of Envt'l Protection, 17 FALR 22, 32 (1994) (determination of attorneys fees is final order appealable to the District Court of Appeal); Sunrise Community, Inc. v. Department of Health and Rehabilitative Servs., 15 FALR 5162, 5164-65 (1992) (the hearing officer has final order authority to award costs and attorney fees under paragraph 120.57(1)(b)5.); Department of Health and Rehabilitative Servs. v. W.F.L., 13 FALR 2976, 2982 (1988) (a separate final order is contemplated by paragraph 120.57(1)(b)5.); Chipola Basin Protective Group, Inc. v. State, Dep't of Envt'l Regulation, 11 FALR 467, 487 (1988) (a referring agencyitself ordinarily a litigantcan neither make nor reverse such awards).

On October 13, 1998, the administrative law judge entered the final order under review. We treat the notice of filing final order dated October 19, 1999, as a notice of appeal. When, on September 18, 1997, the administrative law judge originally declined to enter a final order, Friends was relegated to appealing SJRWMD's "final order." We concluded that the order was not final and "relinquished" jurisdiction for the administrative law judge "to render a final order on the issue of sanctions under section 120.57(1)(b)5, Florida Statutes (1995)."
[2] The letter, which SJRWMD received on June 12, 1996, reads:

Please include me on the list of interested parties to receive future information and/or updates regarding the proposed Amelia Outlet Mall that is to be located in Nassau County. It is my understanding that this project has three pending permit applications with the St. Johns River Water Management District: (1) Permit # X-XXX-XXXXA; (2) Permit # XX-XXX-XXXXA; and (3) Permit # X-XXX-XXXXAG-ERP.
[3] This request for information went into technical detail suggesting that SJRWMD staff had carefully scrutinized the application and was at the point of making a decision:

The staff has reviewed your response [to] the District's request for additional information. Unfortunately the following technical information is lacking to sufficiently review the possible impacts the project may have on the surrounding area....
1. Please provide plans signed and sealed by a professional engineer [40C-42.025(1)].
2. Please provide the pre and post-development drainage maps for the project. Delineate the areas referred to in the project narrative, and all basins which have been modeled using adICPR. Specifically, the narrative states that 100 feet on each side of Johnson Lake Road will drain to the pond. It appears that presently the entire area east of the new Johnson Lake Road, and west of 95, drains to the site. Also, forty seven acres of new development has been included in the model but is not shown on the plans. Please delineate this area. The narrative refers to an area north of A-1-A which will be diverted around the project. Please delineate this area and provide appropriate calculations for any diversion structures planed [40C-4.301(1)(a)3.].
3. The calculations indicate an orifice and pump station will be utilized for maintaining normal water level in the main pond. These are not included on the plans. Please show the location of the orifice and pump station on the paving and grading plans, and provide a detail [40C-4.301(1)(a)6.].
4. Please provide a minimum of 3:1 side slopes between normal water level, and two feet below normal water level [40C-42.026(4)(j)].
5. Please number (or otherwise identify) the structures on Sheets 10 through 15 [40C-4.301(1)(a)6.].
6. There does not appear to be a collection system along the portion of Johnson Lake Road which runs north-south, adjacent to the outlet mall. Please indicate how this area will be collected and routed to the pond [40C-4.031(2)(a)1.].
7. The calculations indicate that this is a master system designed for 59.08 acres of impervious. Please show on plans (the post development drainage map) the location of the areas intended for future development [40C-301(1)(a), (2)(a)].
8. A curve number of 92 is used for pre and post development. Please provide the source of the pre-development curve number [40C-4.301(1)(a)3.].
9. A time of concentration of 10 minutes is used for pre-development over a 69.5 acre parcel. Please provide calculations for all time of concentrations (pre and post) used in the adICPR model [40C-301(1)(a)3.].
10. The stage-storage calculation for the treatment volume between elevations 8.45 and 12.3 is incorrect. Please provide a revised stage storage table, with areas and volumes calculated in minimum two foot increments [40C-42.025(5)(a)].
11. The 25 year storm routing submitted with this application indicates that the post-development peak flow will exceed the pre-development peak flow for the project. A different model has been submitted for the same project under the Amelia Outlet Center application (X-XXX-XXXXA-ERP). Please clarify [40c-4.301(1)(a), (2)(a)].
12. The narrative indicates that the drainage from an existing residential area may be served by this system. Please demonstrate that flood protection for this off-site area will not be adversely impacted if the pump system, proposed to control the water elevation in the pond, is knocked out during a storm. Please discuss whether an emergency generator and back-up pumps are proposed, and model peak stages in the pond under the condition that the pump(s) has failed and the water level is at the weir as an initial condition of the 25 year storm event [40C-4.301(1)(a)3.].
SJRWMD's final written request for information as to permit application # X-XXX-XXXXA was also made on June 17, 1996, and a reply was received on June 24, 1996.
SJRWMD's final written request for information as to permit application # XX-XXX-XXXXA was made on April 30, 1996, and a reply was received on June 25, 1996.
[4] Mr. Alderman later sent Mr. Cordy a detailed summary of his conclusions by facsimile transmission. One thing Mr. Alderman mentioned was the elevation of a stormwater management pond in relation to surrounding groundwater elevations. He expressed concern that, if the bottom or sides of the pond were sufficiently permeable, water from adjacent wetlands would seep into the pond and fill it. Specifically, Mr. Alderman noted:

The normal water level in the pond appears to be very low considering the adjacent wetland's elevation and the close proximity to the pond. I believe the pond's normal water elevation would have an adverse hydrological effect on the adjacent wetland. The normal water level is 8.45 [feet] and the ground elevation of the adjacent wetland is at elevation 10.0 to 11.00 [feet].
No geotechnical report was offered to validate the normal water elevation in the pond. Recommend at a minimum, three deep auger borings in the pond should be performed and the results reviewed by a professional geotechnical engineer.
In effect, Mr. Alderman concluded that the pond was situated in a way that called into question its ability to retain stormwater runoff from the outlet mall. Overflow during storms might deliver contaminating runoff from the outlet mall to surrounding wetlands, unmitigated by residence in the pond and precipitation of pollutants there. He also noted other potential problems with the design of the stormwater management system.
[5] The petition filed with regard to permit No. 4-089-0064G-ERP alleged:

11. Rule 40C-4.301 sets forth the conditions for issuance of a permit for surface water management systems. Nassau County has not provided reasonable assurances that its proposed project will meet the criteria of this Rule.
12. The Petitioner disputes that Nassau County provided reasonable assurance that the construction and operation of the proposed project will: not cause adverse water quantity impacts to receiving waters and adjacent lands; not cause adverse flooding to on-site or off-site property; not cause adverse impacts to existing surface water storage and conveyance capabilities; and be capable of being performed and of functioning as proposed. Specifically, the Petitioner alleges that:
(a) the normal water level of the stormwater pond that is part of the proposed project is lower than the elevation of the adjacent wetland area. The lower elevationof the stormwater pond will have an adverse hydrological effect on the adjacent wetlands by drawing the wetlands and degrading the water quantity of the adjacent wetland;
(b) No geotechnical report was offered to validate the normal water elevation in the stormwater pond;
(c) If the pump fails during a 25-year/24-hour storm event, the berm around the stormwater pond will be breached and the adjacent property will be inundated. According to data submitted with the application, the design high water elevation is 17.14, while the top of the berm is only 17.00.
(d) With the pump operating normally, the stormwater pond does not provide the necessary 1.0 foot of freeboard for the required 25-year/24-hour storm event. The design high water is at elevation 16.67 and the top of the berm is only at elevation 17.00.
(e) The Advanced Interconnected Pond Routing (AdICPR) output is inconsistent in Nassau County's responses to the District's request for additional information letters to Nassau County. The input and output data is not coherent. For example, the Pump Failure file dated 6-26-96 does not match the A-1-A Master Retention Pond file dated 6/20-96, yet they are presented as one file in Nassau County's responses to the District;
(f) The outfall boundary node from the stormwater pond is set too low, at elevation 9.00. The existing ground is at approximately elevation 10.50. Therefore, the boundary node should be at or above the elevation of 10.50;
(g) The control structure in the stormwater pond does not have adequate downstream erosion protection for the amount of flow that is expected to overtop the weir. This will lead to a wash of sediment into the wetlands;
(h) The proposed project relies on pumps, which are mechanical devices that should be avoided when discharging from a stormwater pond; and
(i) No calculations were provided for the interconnected attenuation ponds on the mall site. Without calculations and stormwater modeling, it cannot be sufficiently determined whether these facilities will work properly.
13. The Petitioner disputes that Nassau County provided reasonable assurance that the construction and operation of the proposed project will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters. Specifically, the Petitioner alleges that neither Nassau County nor any other entity has performed a threatened and endangered species survey for the subject property, even though the property includes habitat that is suitable for threatened and endangered species.
14. The Petitioner disputes that Nassau County provided reasonable assurance that the construction and operation of the proposed project will not cause adverse secondary impacts to the water resources. The County has failed to provide reasonable assurance that the proposed project will not adversely affect the adjacent wetlands located off-site.
15. Nassau County did not adequately demonstrate that it utilized feasible design alternatives to minimize and avoid impacting water quality or wetland functions before offering mitigation to offset such impacts.
16. Rule 40C-4.302 sets forth additional conditions which must be met for the issuance of a permit. Nassau County has not provided reasonable assurances that its proposed project will meet the criteria of this Rule.
17. The Petitioner disputes that Nassau County provided reasonable assurance that the construction, operation, and maintenance of the proposed project will not be contrary to the public interest. In particular, the Petitioner alleges that:
(a) The proposed project will adversely affect the public health, safety, welfare, or the property of others because of the stormwater pond's potential to inundate adjacent property during 25-year/24-hour storm events and because there is no adequate assurance that the interconnected attenuation ponds on the mall site will work properly and not adversely impact the property of others;
(b) The proposed project will adversely affect the conservation of fish and wildlife, including threatened or endangered species, or their habitats in that neither Nassau County nor any other entity has performed a threatened and endangered species survey for the subject property, even though the property includes habitat that is suitable for threatened and endangered species; and
(c) The proposed project will adversely affect the flow of water and will cause harmful erosion in that the control structure in the stormwater pond does not have adequate downstream erosion protection for the amount of flow that is expected to overtop the weir. This will lead to a wash of sediment into the wetlands.
18. Nassau County did not adequately demonstrate that it utilized feasible design alternatives to minimize and avoid impacting water quality or wetland functions before offering mitigation to offset such impacts.
19. The Petitioner disputes that the project's mitigation does in fact offset its environmental impacts.
20. Rule 40C-42.027, F.A.C. sets forth the types of entities that the District considers acceptable for ensuring that a project will be operated and maintained in compliance with the requirements of the District's rules. The Petitioner disputes that the proposed project will meet the legal operation and maintenance entity requirements of rule 40C-42.027. While Nassau County meets the legal operation and maintenance entity requirements of this rule, Nassau County will not be the entity charged with operation and maintenance of the proposed project. Instead, Fisher Development, the owner of the adjacent outlet mall that will be served by the proposed project, and Nassau County have agreed that Fisher Development will undertake operation and maintenance of the proposed project.
21. Fisher Development is not one of the acceptable legal operation and maintenance entities recognized by this Rule. Even if Fisher Development could be recognized as an acceptable entity under this Rule, Nassau County did not provide reasonable assurance as required by Rule 404.301(1)(j) as to Fisher Development's financial, legal and administrative ability to provide for the long-term operation and maintenance of the proposed project. Accordingly, the requirements of rule 40C-42.027 and Rule 40C-4.301(1)(j) have not been met.
The petition filed with respect to permit No. 4-089-0065 alleged:
12. Rule 40C-4.301 sets forth the conditions for issuance of a permit for surface water management systems. Fisher has not provided reasonable assurances that its proposed project will meet the criteria of this Rule.
13. The Petitioner disputes that Fisher provided reasonable assurance that the construction and operation of the proposed project will be capable of being performed and of functioning as proposed. No calculations were provided for the interconnected attenuation ponds on the mall site. Without calculations and stormwater modeling, it cannot be sufficiently determined whether these facilities will work properly.
14. The Petitioner disputes that Fisher provided reasonable assurance that the construction and operation of the proposed project will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters. Specifically, the Petitioner alleges that neither Fisher nor any other entity has performed a threatened and endanger species survey for the subject property, even though the property includes habitat that is suitable for threatened and endangered species.
15. The Petitioner disputes that Nassau County provided reasonable assurance that the construction and operation of the proposed project will not cause adverse secondary impacts to the water resources. The County has failed to provide reasonable assurance that the proposed project will not adversely affect the adjacent wetlands location off-site.
16. Fisher did not adequately demonstrate that it utilized feasible design alternatives to minimize and avoid impacting water quality or wetland functions before offering mitigation to offset such impacts.
17. Rule 40C-4.302 sets forth additional conditions which must be met for the issuance of a permit. Fisher has not provided reasonable assurances that its proposed project will meet the criteria of this Rule.
18. The Petitioner disputes that Fisher provided reasonable assurance that the construction, operation, and maintenance of the proposed project will not be contrary to the public interest. In particular, the Petitioner alleges that:
(a) The proposed project will adversely affect the public health, safety, welfare, or the property of others because there is no adequate assurance that the interconnected attenuation ponds on the mall site will work properly and not aversely impact the property of others; and
(b) The proposed project will adversely affect the conservation of fish and wildlife, including threatened or endangered species, or their habitats in that neither Fisher nor any other entity has performed a threatened and endangered species survey of the subject property, even though the property includes habitat that is suitable for endangered and threatened species.
19. Petitioner disputes that the project's mitigation does in fact offset its environmental impacts.
The petition filed with respect to permit No. 12-089-0031 alleged:
12. Rule 62-312.080 sets forth the conditions for issuance of a dredge and fill permit. Fisher has not provided reasonable assurances that its proposed project will meet the criteria of this Rule.
13. The Petitioner disputes that Fisher provided reasonable assurance that the proposed dredging and filling will not violate water quality standards.
14. No calculations were provided for the interconnected attenuation ponds on the mall site. Without calculations and stormwater modeling, it cannot be sufficiently determined whether these facilities will work properly.
15. The Petitioner disputes that Fisher provided reasonable assurance that the project is not contrary to the public interest in accordance with the factors set forth in section 403.918(2), Florida Statutes.
16. The Petitioner disputes that adequate consideration was given as to whether the project will adversely affect the public health, safety, or welfare or the property of others. For example, there is no adequate assurance that the interconnected attenuation ponds on the mall site will work properly and will not adversely impact the property of others.
17. The Petitioner disputes that adequate consideration was given as to whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats. For example, neither Fisher nor any other entity has performed a threatened and endangered species survey for the subject property, even though the property includes habitat that is suitable for threatened or endangered species.
18. No consideration was given to the impact of the project for which the permit is sought, as required by section 403.919(1), Florida Statutes. The demands on surrounding wetlands that will be created by a large scale outlet mall and parking area were not adequately addressed.
19. Fisher did not adequately demonstrate that it utilized feasible alternatives to minimize and avoid impacting water quality or wetland functions before offering mitigation to offset such impacts.
20. The Petitioner disputes that the project's mitigation does in fact offset its environmental impacts.
[6] Ms. Bevis acknowledged that she did not personally investigate the matters alleged in the petitions. She said she relied on Mr. Commander's representation that there were environmental problems with the project. Although the verified petitions alleged that Friends received notice from SJRWMD of the intent to issue the permits, she conceded that it was Mr. Theriaque who actually received the notice. She testified she was not aware who paid Mr. Theriaque's and Mr. Commander's fees and did not know who hired them to represent Friends.
[7] Mr. Theriaque, who had never communicated directly with Ms. Bevis before she signed, was not present when she signed the petitions. He had signed them before transmitting the petitions to Mr. Commander.
[8] Nassau County's agreement to install the clay liner was reflected in a letter dated and stamped in by SJRWMD on July 1, 1996. The record does not reveal when this change of plans came to the attention of Friends, Ms. Bevis, or Messrs. Commander or Theriaque.
[9] The administrative law judge recommended awarding fees under section 120.59(6), Florida Statutes (1995), as well as under section 120.57(1)(b)5. When the case reached SJRWMD for entry of a final order, SJRWMD rejected the recommendation to award fees under section 120.59(6). Fisher and Nassau County have not appealed that decision.
[10] In Mercedes Lighting and Electrical Supply, Inc. v. State, Department of General Services, 560 So.2d 272, 277-78 (Fla. 1st DCA 1990), we concluded that, because the Legislature incorporated only the "improper purpose" criterion in the statute, the other prongs of Rule 11 were intentionally omitted and do not apply. The statute lists frivolous purpose, unnecessary delay, and harassment as examples of improper purpose.
[11] Once the clay liner was decided upon, a claim that placing the stormwater management pond at the planned elevation would itself adversely affect water quality lacked merit. Friends conceded as much in its notice of voluntary dismissal. At the time Friends filed its petitions, moreover, Fisher had already agreed to add a clay liner to the stormwater management ponds.

But Mr. Theriaque had performed an objectively reasonable inquiry before filing the petitions. He asked another lawyer to copy the permit files and deliver them to Mr. Cordy. After Mr. Cordy examined the files, they were sent to Mr. Alderman, an engineer, who identified several problems with the design of the stormwater management system. Based on Mr. Alderman's expert opinion, Mr. Theriaque had a reasonable basis to believe that Friends had clear legal justification to make its claims, including those regarding the elevation of the stormwater management ponds.
The applicants point out that the evidence did not establish that the entire contents of the application files, including the July 1, 1996, letter agreeing to install a liner, reached Friends' experts before they formed their opinions. But neither did the evidence establish that the information was not furnished to their experts by that time.
The record does not reveal the exact date on which Ms. O'Hara inspected SJRWMD's application files. For that reason, it is unclear whether the documents then in the files specified addition of the clay liner. For the same reason, it is unclear whether the documents she copied and furnished to Mr. Cordy (which he furnished in turn to Mr. Alderman) made mention of a clay liner.
Some sixteen days elapsed after Sims sent a letter to SJRWMD specifying the clay liner, before the notice of intent issued. On this record, failure to double check to determine whether additional filings had been made during the two or three weeks before the notice of intent to issue affords no basis for sanctions. Mr. Theriaque's request to be kept informed, his firm's multiple public record requests, and, of special importance, the apparently final response to what was in fact SJRWMD's last written request for information combined to make his inquiry a reasonable one. Again, moreover, Fisher and Nassau County did not prove that Friends' experts had not received copies of Sims' letter to SJRWMD of July 1, 1996, and of the revised plans, before formulating their opinions.
[12] The test is whether the inquiry was reasonable. A lawyer cannot automatically shield himself from liability for sanctions by purportedly relying on the opinion of an unscrupulous or incompetent "hired gun." The standard is whether, under the circumstances, a reasonable lawyer would have relied on the expert's opinion. In the present case, Fisher never challenged the credentials either of Mr. Alderman or of Mr. Cordy. The record contains no basis for concluding that Mr. Theriaque's reliance on the experts was anything other than reasonable.
[13] The doctrines of champerty and maintenance are rooted in the common law. Section 120.57(1)(b)5., Florida Statutes (1995), does not, however, authorize an award of attorney's fees on account of champertous conduct.

"Maintenance is an officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise, to prosecute or defend it." 9 Fla.Jur.2d Champerty and Maintenance § 1 (1979). Under the modern view, "it is the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring [an] action[ ] or to... defen[d a suit] which they have no right to make...." Id.
Champerty is a form of maintenance wherein one will carry on a suit in which he has no subject-matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered. 14 C.J.S. Champerty and Maintenance § la (1991).
Kraft v. Mason, 668 So.2d 679, 682 (Fla. 4th DCA 1996). See also Cone v. Benjamin, 157 Fla. 800, 27 So.2d 90, 107 (1946) ("[T]he rule is well settled that the fact that there is a champertous contract in relation to the prosecution of the suit between plaintiff and his attorney, or between plaintiff and another layman, in no wise affects the obligation of defendant to plaintiff.").
An administrative law judge's award of attorney's fees must be based upon statutory or contractual authority. See, e.g., Laborers' Int'l Union v. Burroughs, 541 So.2d 1160, 1163-64 (Fla.1989); Kittel v. Kittel, 210 So.2d 1, 3 (Fla.1967). Compare Davis v. School Bd. of Gadsden County, 646 So.2d 766, 769 (Fla. 1st DCA 1994), with Dade County v. Pena, 664 So.2d 959 (Fla.1995).
[14] The administrative law judge forcefully identified what she perceived as several problems with the "actions of the attorneys." We note, however, the massive discovery and prompt settlement that took place in the present case.

38. The actions of the attorneys demonstrate a purpose that is improper in the context of the goal of administrative proceedings. Administrative proceedings are designed to allow a third party who has standing either as a substantially affected party or as a citizen pursuant to the provision of Section 403.412, Florida Statutes, [including domestic corporations not for profit, see Florida Wildlife Fed. v. State Dep't of Envt'l Regulation, 390 So.2d 64, 68 (Fla. 1980)] to influence an agency's actions and require that a permit comply with all permitting criteria. By setting up and representing a sham client, the attorneys have prevented this tribunal from determining whether the hidden client has any legal standing. The entire fabric and fairness of an administrative proceeding is undermined by such attorney activities.
39. Through such actions, the agency involved is prevented from determining the true scope of the complaints brought to issue by the Petitioner, and the permit applicants are prevented from discovering that design or operation modifications could be made to make the project acceptable. If the true parties to the proceedings are unknown, true discovery cannot be conducted, and the possibilities for settlement on the issues are vitiated.
The standing of non-parties is not, of course, material. Section 120.57(1)(b)5., Florida Statutes (1995), does not authorize sanctions against non-signatory non-parties.
[15] Another reason imposition of sanctions on Messrs. Commander and Theriaque was improper is that the applicants' motions did not seek sanctions against either man individually. While the motions sought sanctions against Foley and Lardner, Mr. Commander's law firm, they did not seek sanctions against Mr. Theriaque's law firm. Without notice that he was a target, Mr. Theriaque appeared as counsel at the evidentiary hearing on the motion for sanctions.
[16] The delay of nearly eighteen months between the hearing and the order was caused by an error regarding the administrative law judge's authority to render a final order. Originally, the judge prepared a recommended order which she submitted to the agency. The agency's order was appealed and on September 25, 1998, we remanded the case directly to the administrative law judge for rendition of a final order.
[17] We noted only one exception to this rule: the appellate court may engage in de novo review of a sanctions order that determines the sufficiency of the pleading. See Mercedes, 560 So.2d at 277, citing Donaldson v. Clark, 819 F.2d 1551 (11th Cir.1987). That exception no longer applies, as the federal decisions upon which it was based have been overruled. After the decisions in Clark and Mercedes, the United States Supreme Court held in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), that all aspects of an appeal from an order imposing sanctions under rule 11 are reviewed by the abuse of discretion standard.